342 So.2d 422 (1977)
Willie Morris SMITH
v.
STATE.
3 Div. 581.
Court of Criminal Appeals of Alabama.
February 1, 1977.
*423 Charles Tom Payne, Montgomery, for appellant.
William J. Baxley, Atty. Gen. and Joseph G. L. Marston, III, Asst. Atty. Gen., for the State, appellee.
MOORE, Retired Circuit Judge.
The appellant was indicted, tried, and convicted for robbery. Final judgment was entered on May 27,1976 and appellant gave notice of and took an appeal on that date.
Clifford A. St. John, Sr., testified in substance that he is eighty years of age and lived at 110 Broadway on November 21, 1975. That morning he went out to his tractor to haul some fertilizer and while he was getting ready to go he was shot from the rear. He stated the bullet penetrated under his right shoulder and ". . . came our right here (indicating)." He was in his back yard at the time working on the truck and he heard the report of a rifle. After he sensed this he blacked out. The next thing he remembered was lying on his face a little further toward the house. He crawled into the house where he dragged the telephone off of a shelf onto the floor and called his daughter-in-law. Afterwards he was in the hospital ten days. St. John stated that on that day, he had the following money in his pocket: two tens, three fives, and six ones. He testified his wallet was in his pocket when he walked outside and that he has not seen the money since. He did not know the appellant and had never seen him before. St. John did not give anyone permission to take any money out of his wallet or to take his wallet. He stated his home is in Montgomery County, Alabama. St. John further testified he did not see the person that shot him.
Dorothy St. John testified that she lived next door to Clifford St. John, Sr., who was her father-in-law. On November 21, 1975, she went to his home in answer to a phone call and found him with his feet on the back steps and lying half-in and half-out the door. She saw that he had blood on his chest and she called the "emergency" number. Later an ambulance and the police arrived.
Detective R. E. Fisher, a Montgomery policeman, testified that he arrived at the scene of the shooting, 110 Broadway, about 9:00 o'clock. St. John, Sr. had already been taken to the hospital when he got there. Fisher found blood on the edge of the pickup truck parked about 115 feet from the back door of the house. He also found a walking stick and a hat lying on the ground about twenty feet from the back door. When other detectives came to the scene, Fisher went to the hospital to check on St. John and the case was turned over to Detective Alford.
Detective E. B. Alford testified in substance that he investigated the shooting at 110 Broadway. He arrived at the scene about noon on the day in question and used a metal detector and recovered a .22 caliber spent hull on the fence behind the truck where St. John was shot and about 75 feet from where St. John was shot. A pecan tree was "on" the fence south from where St. John was shot and the hull was found four feet northeast of that tree. He received the hull which he kept in his possession and turned over to Charles Smith, a State toxicologist. Alford identified State's Exhibit No. 3 as the hull and the envelope the hull was placed in after it was found. He said the hull, part of said exhibit, was the one he turned over to the toxicologist. Alford also stated that the pecan tree near where the hull was found, had a place on it about four and one-half feet high, where the bark had been brushed off which was very fresh. He testified there was a plowed area, garden-type spot, behind the tree with a hedge row about twenty-five feet behind that beside the railroad track in a ditch. The railroad track was behind St. John's house. Alford further testified that someone else, between 9:00 and 12:00 o'clock the day of the shooting took place, could possibly have made the marks on the *424 tree and that the shooting took place about 8:00 A.M. This witness identified a diagram of the scene drawn by Sgt. Terry and it was admitted as appellant's Exhibit No. 1.
On cross-examination, Alford testified that he did not place the hull in the envelope marked State's Exhibit No. 3, but that he and Detective Johnson put it into the envelope together.
Clifford St. John, Jr., testified in substance, that he lived at 106 Broadway and that Clifford St. John, Sr. was his father. He saw his father about 8:30 A.M. on November 21, 1975. He was called at work and came home, where he saw his father in the backyard on a stretcher. He then carried his father to Jackson's Hospital. St. John Jr., then came back to the house and looked for his father's billfold, but it was the next morning when he found it on the railroad track west of the house. He did not move the billfold from where he found it, but called the police. Some papers were there near the billfold and St. John, Jr. found a rifle back there. St. John, Jr. was shown State's Exhibit No. 1, a rifle, and he stated he could not say it was the exact one he saw but it was similar. He further testified that a black policeman came and picked the rifle up and left with it.
John Goldman testified in substance that he lived at 456 Shannon Hill and that on November 18, 1975, a .22 caliber rifle was missing from his home. He stated State's Exhibit No. 1 was his rifle that was missing from his home.
Detective Sidney Williams testified in substance that he received a phone call from St. John, Jr., November 22, 1975, and went out to St. John's home at 110 Broadway. St. John, Jr. showed him a rifle at a point two hundred feet in a westerly direction from the house down by some railroad tracks and some identification papers were also there in the weeds. This witness was shown State's Exhibit No. 1, and said it was the rifle he was shown by St. John, Jr. by the railroad tracks. He brought the rifle back to headquarters, initialed it, and the toxicologist came and he turned the rifle over to him. Williams identified State's Exhibit No. 4 as the papers found in the weeds near the rifle. He also found a wallet at the same place. Williams turned the papers over to the toxicologist, Charles Smith, along with the rifle. Exhibit No. 4 was admitted in evidence.
Charles Wesley Smith testified in substance that in November, 1975, he was a State Toxicologist. His qualifications were stipulated. He ran tests on and examined the .22 rifle hull and the .22 rifle (State's Exhibits 1 and 3). He found the evidence hull and test hull to be consistent in major class characteristics, meaning the shape of the marks, etc. However, he did not find enough individual characteristics to definitely state that it came from the same weapon, but did not find any inconsistent markings.
Harvey Daniel testified that he went to Stella Mae Ford's home in November, 1975 and saw appellant there. He was at that house twice. On the first visit he bought a "component set" from appellant. He bought a rifle from him on the second visit. In addition to the rifle he bought, the appellant had another rifle there in his possession. This witness was shown State's Exhibit No. 1 and he identified it as the rifle he saw in appellant's possession on the second visit. On cross-examination, this witness said if the State's Exhibit was not the rifle he saw appellant with, it was just like it. He further testified that Charles Cotton and Stella Mae Ford were at the Ford home on his second visit.
Charles Everett Cotton testified in substance that he knew appellant back in November, 1975. In that month he saw appellant at Stella Ford's home and saw Harvey Daniel buy a rifle from him. Cotton stated that on that date the appellant had another rifle there that looked exactly like State's Exhibit No. 1.
Stella Ford testified she knew appellant, Charles Cotton and Harvey Daniel, and that on October 20,1975, those three were at her home on Holcomb Street. She stated that at that time and place, appellant had the rifle across his lap and told Charles that he *425 was going to "shoot a white m___f___ with it." Ford said the gun appellant had at the time looked like State's Exhibit No. 1. Further, she stated that later on October 20, 1975, appellant came back and got the gun. Ford also testified that appellant came back to her home on the 22nd and said ". . . he shot a white m___f___down by the bridge with this gun. `I just killed a man down by the bridge, I was there all night.'"
George Leak testified in substance, that he was a detective in the Montgomery Police Department. On December 8th he came in contact with appellant on Wetumpka Road and carried him to a residence on Cedar Street that had been burglarized. Leak then took him downtown. He stated that when they first picked appellant up he advised him of his rightsthat he had the right to remain silent; that he had the right to talk to a lawyer before being questioned; that anything he said could be held against him in a court of law; and if he wanted a lawyer and could not afford one, that the court would appoint one before questioning him. Leak testified that appellant said he understood those rights. Later on, Leak questioned the appellant about this case and he gave him a written statement at it related to the weapon that was used. Appellant did not say anything related to the question as to whether he did or did not go to 110 Broadway, but at 8:00 P.M. he signed a standard rights form. Leak said that when they first picked appellant up that morning he said he did not want an attorney and that he gave the statement that night about eight hours later. Leak stated he read the "rights" sheet to appellant and asked him if he understood it and went over it orally with him. He said he told the appellant he was a policeman. This witness was shown a picture of a rifle (State's Exhibit No. 5) and he stated he showed that picture to appellant on December 8, 1975. He stated that before talking with appellant he advised him of his rights, and that appellant said he understood them. This witness restated what he told the appellant his rights were, as set out above. At this point the district attorney by questions addressed to the witness and answers of the witness developed the facts necessary to show that any statement made by the appellant was voluntarily made. The witness was then asked the following questions and gave the following answers thereto:
"Q Okay. Now, what did he say when you showed him that picture that's been marked State Exhibit 5?
"A He said that he had seen that rifle before.
"Q That rifle before?
"A Yes, sir.
"Q All right, sir. And what, did he, did he, what did he say then?
"A He said that this rifle had some scratches up at the front end, and that if shown the rifle, that he could tell me a lot of different things about the different scratches that would show that that was the rifle.
"Q Okay. And I'll show you what's been marked State Exhibit 5, Detective Leak, and I'll ask you if that picture, excuse me, this is State Exhibit One, I'll ask you if State Exhibit Five, the photograph is a photograph of State Exhibit One?
"MR. PAYNE: I object to any Court identification of it, if he has the rifle, let him show it to him and let him see if that's it.
"THE COURT: You asked if that was a picture of this rifle, I overrule your objection.
"BY MR. POOL:
"Q Is it, Detective Leak?
"A Yes, sir."
Leak then testified that he read the written form of appellant's rights which is set out in the record and is a complete "Miranda" warning. He stated that appellant said he understood it and signed it and that the appellant was not threatened or coerced in any manner to make a statement. Further, he testified that no promises or hopes of reward or inducements were made to appellant to induce a statement. Leak said appellant then made a written statement in *426 which he said that he had acquired this rifle at 456 Shannon Hill Road; that Charles Cotton had sold it to somebody named "Fats"; and that appellant went with him and showed him 456 Shannon Road where he got the rifle on December 8, 1975.
State's Exhibits 1, 3 and 5, were admitted in evidence, Exhibit No. 4 having been admitted previously.
The appellant's motion to exclude the State's evidence on the ground of failure to prove a prima facie case was denied and overruled.
The appellant did not offer any witnesses in his behalf and there were no objections to the court's charge to the jury.
The appellant's requested charges were all given except the general charge and requested charge nine, which was covered by the court's oral charge.
The appellant contends in this appeal that the trial court committed reversible error in overruling his motion to exclude the State's evidence on the ground that the State had not made out a prima facie case.
The evidence in this case, to a great extent, must be classified as circumstantial. It is for that reason that we have set out the evidence, or the substance thereof, in considerable detail in this opinion. However, we have not stated every detail of the evidence.
In Willingham v. State, 28 Ala.App. 261, 183 So. 887, the court stated:
"The case therefore presented, is one entirely of circumstantial evidence, and while a conviction may rest on circumstantial evidence, if sufficiently strong and cogent, such conviction should be carefully scrutinized by the judiciary."
A well connected train of circumstances may be as cogent of the existence of a fact as any array of direct evidence. Perez v. State, 34 Ala.App. 406, 40 So.2d 344; Desilvey v. State, 245 Ala. 163, 16 So.2d 183.
The measure of proof required in a case where conviction is sought on circumstantial evidence is stated in this manner in Pruett et al. v. State, 33 Ala.App. 491, 35 So.2d 115:
"It is evident that a conviction depended in the main on circumstantial evidence. It is apparent, also, that the doctrines of conspiracy and `aid and abet' have places in the review.
"It is a similar rule that `a person charged with a felony should not be convicted unless evidence excludes to a moral certainty every reasonable hypothesis but that of his guilt, and that, no matter how strong the circumstances were, they did not come up to full measure of proof which the law required if they could be reasonably reconciled with theory that defendant was innocent.' It follows that if the evidence does exclude to a moral certainty every reasonable hypothesis, etc., a conviction is authorized on circumstantial evidence." [Citations omitted].
The appellant in the case before us did not file a motion for a new trial. The only attack he made on the sufficiency of the evidence to support the verdict was his motion to exclude the evidence on the ground a prima facie case had not been made out. However, he argued in brief on this appeal that the evidence was not convincing enough to allow the verdict to stand. That is one of the functions of a motion for a new trial and should not be first presented on appeal. But laying that aside for a moment, the law is clearly stated in Davis v. State, 33 Ala.App. 299, 34 So.2d 15, cert. denied 250 Ala. 240, 34 So.2d 17, that:
"`A new trial, on the grounds that the verdict is contrary to the evidence, will not be granted where it affirmatively appears that the questions involved are for the determination of the jury, unless it is clearly apparent that the verdict is palpably wrong or unjust.'" [Citations omitted].
On motion to exclude the evidence for failure to make out a prima facie case it has been uniformly held by the appellate courts of this State that if the State has presented substantial evidence tending to prove all elements of the charged offense and the *427 guilt of the defendant a jury question is made out and such motions should be denied and overruled. Massengale v. State, 36 Ala.App. 195, 54 So.2d 85; Sullivan v. State, 48 Ala.App. 347, 264 So.2d 576.
The evidence in this case shows: that on November 21,1975, Clifford A. St. John, the victim of the robbery charged in the indictment, was at his home; that his home was at 110 Broadway; that he heard the report of a rifle and was shot from the rear; that he had forty-one dollars in his pocketbook in his pocket when he was shot; that he had not seen the money since he was shot; that he went to the hospital but his wallet was not with him in the hospital; that he did not give anyone permission to take his wallet or his money; and that his home was in Montgomery County, Alabama. St. John did not see who shot him. He was shot in the back and the bullet came out the front. The evidence showed that the bullet was not left in him.
The officers testified, as may be noted from the statement of facts, that a .22 caliber hull (one that had been fired) was found on the premises near where St. John was shot and that it was turned over to the toxicologist. Further, they testified that a .22 caliber rifle was found on the railroad track or near it along with some papers and a wallet, the next morning after the shooting and the robbery. These items were first found by the son of the victim who identified the wallet as belonging to the victim and said items were pointed out by him to the officer. That officer testified that these items were found about two-hundred feet in a westerly direction from the victim's home along a railroad track and that he turned the papers and the rifle over to the toxicologist. The toxicologist testified that he examined the .22 hull and the rifle and fired test hulls in the rifle and found the evidence hull and the test hulls to be consistent in major characteristics, meaning the shape of the marks, etc. The rifle in question was introduced in evidence as State Exhibit No. 1, and a picture of it was State's Exhibit No. 5. One of the officers testified that he showed the picture (which became Exhibit No. 5) to the appellant, after his arrest, and that he said he had seen the rifle before and that it had some marks on it which he could talk about and show that was the rifle. In a statement given to that same officer, the defendant stated that he acquired the rifle at 456 Shannon Hill Road and that on December 8, the appellant went with him and showed him 456 Shannon Hill Road where he got the rifle. There was other evidence in the case strongly tending to show appellant had the rifle in question in his possession before the robbery. The fact that the rifle was thrown away or abandoned at the same place where the victim's wallet was found has a tendency to connect it with the robbery. Witnesses testified to statements made to them by the appellant: that he was going to shoot a "white m___ f___" with the rifle and that at that time he had the rifle; and that he later said he shot a "white m___f___" down by the bridge; and that he was there all night. The evidence showed that the robbery victim was shot about 8:00 A.M. This evidence along with the rest of the evidence detailed in this opinion, is substantial evidence of the guilt of the appellant and presented a jury question. The verdict of the jury is not unjust or palpably wrong. It was factually and legally justified by the evidence and should not be disturbed on this appeal. Error does not appear in that respect.
The appellant also complains that evidence of another crime was admitted in evidence in this case. The district attorney in following the chain of events that placed the rifle in question in the possession of the appellant did show that the rifle had been taken in a burglary of a home at 456 Shannon Hill Road and that it belonged to the witness, John Goldman.
The rule of evidence in that respect is stated in Sneed v. State, 243 Ala. 23, 8 So.2d 269, as follows:
"Evidence which is relevant to establish some element of the offense, or material as to some issue in the case, is not rendered inadmissible by the fact that it also *428 tends to show another offense committed by defendant. 22 Corpus Juris Secundum 1116, Criminal Law, § 691, note 31; 20 Amer.Jur. 290, section 311; Wilkins v. State, 29 Ala.App. 349, 197 So. 75, certiorari denied 240 Ala. 52, 197 So. 81. This includes the right to introduce evidence to controvert a material aspect of defendant's evidence. People v. Jennings 252 III. 534, 96 N.E. 1077, 43 L.R.A.,N.S., 1206; Commonwealth v. Snell, 189 Mass. 12, 75 N.E. 75, 3 L.R.A.,N.S. 1019; Cook v. State, 155 Ark. 106, 244 S.W. 735; Johnson v. State, 242 Ala. 278, 5 So.2d 632; Miller v. State, 130 Ala. 1, 30 So. 379; William Patterson v. State, 243 Ala. 21, 8 So.2d 268.
"It is pointed out in Wilkins v. State, supra, that as stated in Wharton's Criminal Evidence, an exception to the rule of exclusion is where the state's evidence is (8) relevant to rebut special defenses.
"In all instances, the question is whether the proposed evidence is primarily to prove the commission of another disconnected crime, or whether it is material to some issue in the case. If it is material and logically relevant to an issue in the case, whether to prove an element of the crime, or to controvert a material contention of defendant, it is not inadmissible because in making the proof the commission of an independent disconnected crime is an inseparable feature of it."
Reversible error cannot be predicated upon the admission of the evidence which tended to show that another offense had been committed because the evidence was material to an issue involved in the offense charged.
We have searched the record for error, as is our duty, but we have found no such error.
The foregoing opinion was prepared by the Honorable L. S. Moore, a retired Circuit Judge, serving as a Judge of this Court, under the provisions of § 6.10 of the new Judicial Article (Constitutional Amendment No. 328); his opinion is hereby adopted as that of the Court.
It is therefore ordered and adjudged by this Court that the judgment of the trial court be and is hereby

AFFIRMED.
TYSON, HARRIS, DeCARLO and BOWEN, JJ., concur.
BOOKOUT, J., concurring specially.
BOOKOUT, Judge, concurring specially:
Of all the facts surrounding this case, it appears that only three circumstances exist from which an inference could be drawn to connect the appellant with the shooting:
1. Appellant's possession of a gun similar to that used by the assailant;
2. Appellant's statement one day prior to the shooting* that ". . . he was going to shoot a white m___f___ with it. . ."; and
3. Appellant's statement shortly after the shooting that he had ". . . shot a white m___f___down by the bridge** . . . ." with the rifle. (Emphasis supplied.)
While the above facts appear, among others related in the opinion, they are the only facts which point to appellant as the assailant. Other testimony was given which connects those facts more clearly with the crime, and which should be set out in this opinion. Those facts were footnoted in the State's brief with sufficient clarity that we should set them out here:
*"1. There was some confusion about the date. Harvey Baniel testified that it was late November, 1975 (R. pp. 52-54). Charles Everett Cotton likewise testified that it was November, 1975 (R. pp. 58-59). However, Stella Ford testified that the incident occurred in November, 1975 (R. p. 64, line 19) but when she was asked the exact date she testified: `It was October 20th, on Thursday.' (R. p. 64, line 23). October 20, 1975, was a Monday, while November 20, 1975, was a Thursday. It is obvious that the witness meant Thursday, November 20, 1975.
**"2. `The bridge' refers to an overpass which carries the Lower Wetumpka Road over the railroad track which passes behind *429 Mr. St. John's house. This overpass is about three hundred feet from the scene of the shooting."