374 So.2d 929 (1979)
Richard GRAHAM
v.
STATE.
4 Div. 685.
Court of Criminal Appeals of Alabama.
March 27, 1979.
Rehearing Denied April 17, 1979.
*930 David C. Emery, Ozark, for appellant.
William J. Baxley, Atty. Gen., and Edwin L. Yates, Asst. Atty. Gen., for the State, appellee.
LEIGH M. CLARK, Retired Circuit Judge.
Appellant was indicted for murder in the first degree of "Donna M. Wilcynski, by stabbing her with a knife or other sharp instrument." A jury found him guilty of murder in the first degree as charged and fixed his punishment at life imprisonment. He was sentenced accordingly.
Appellant submits as the only issue on appeal:
"Whether or not sufficient evidence was presented to sustain the verdict of first degree murder."
We have no doubt that there was bountiful evidence that the alleged victim was brutally slain, in the manner charged in the indictment, by some fiend, and that the homicide was murder in the first degree. The only controverted issue on the trial was whether defendant-appellant committed the homicide.
The record indicates, and almost conclusively shows, that there was no eyewitness to the homicide other than the victim and her murderer(s); that they were the only persons in the apartment of the victim at Byrd Apartments, Ozark, when she was killed, between 11:00 P.M. and midnight on April 11, 1978. Her death resulted from multiple stab wounds in various parts of her body, from front to back and from head to feet. They were so extensive and numerous that the physician who examined her body was unable to number them. He grouped them in a description of them in his testimony as shown by six complete pages of the record. That she was dead before or immediately after the completion of the stabbing of her, there can hardly be any doubt. Her body was not discovered until late in the afternoon on April 12, 1978, after neighboring apartment dwellers had become concerned about her, one of them noting that her automobile was at its accustomed place at the apartment, that she was nowhere to be seen, that her apartment was locked and that efforts to get her to the door were futile. One of them called an officer and soon thereafter a number of them arrived.
Upon arrival of the officers, a master key was obtained, and thereby her apartment was entered by one of the officers, who found her body in the bathtub. He promptly secured the scene and sent for an investigator of the Police Department of Ozark, *931 who soon arrived; he looked at the body in the bathtub, and then observed a three-year-old child in the bedroom of the apartment. He then called the coroner and personnel from the crime laboratory and secured the building for a thorough and accurate on-the-premises criminal investigation by experienced personnel, which was assiduously performed, continuing for about two hours at the scene. Blood samples were obtained, latent fingerprints were lifted, numerous photographs were taken, samples of hair were gathered from the apartment and other physical items of evidence were taken into custody.
The victim's body in the bathtub was lying on its back. All but the face was covered with sheets and other coverings from her bed. Upon removal of the bed coverings, her body was completely nude. There was no water in the bathtub; the drain thereof was closed. The floor of the bathroom was dry, but the carpet or rug in the hall was soaked with water, and the carpet or rugs in the victim's bedroom and in the child's bedroom were wet. A test made by an officer showed that water from the overflowing bathtub would run into portions of the floor of the apartment that were wet.
Bloodstains were found at several places in the apartment, including the mattress and the box springs of victim's bed, the floor, walls, curtains, and on the outside handle of the door to the apartment.
The furniture in the bedroom appeared to be ransacked. The living room appeared to be normal. There were pry marks on the outside of a window to the apartment.
The evidence, consisting of the testimony of twenty-seven witnesses and numerous exhibits, is almost, if not entirely, free of substantial conflict. Witnesses for the State may be grouped:
(1) Those testifying as to conduct of defendant while at Byrd Apartments on Sunday, April 9, 1978,
(2) Those testifying as to his conduct at Byrd Apartments the night of the murder, April 11, 1978,
(3) A few who heard noises in the victim's apartment between 11:00 P.M. and midnight, April 11,
(4) Expert and lay witnesses as to the condition and contents of the victim's apartment at the time her body was discovered therein in the late afternoon of April 12,
(5) Witnesses, chiefly expert witnesses, as to (a) the condition of the corpse, (b) fingerprints, (c) samples of blood found in the victim's apartment, (d) samples of hair from victim's apartment, (e) what was revealed by a search of defendant and his home, (f) statements made by defendant after the murder and (g) what was found in defendant's automobile that he was driving the night of the murder.
Evidence on behalf of defendant consisted of defendant's own testimony as to his conduct on Sunday, April 9, and on the night of the murder and the testimony of his wife, which pertained chiefly to his conduct prior to his going to the Byrd Apartments on April 11 and his return to their home after midnight of the night of the murder.
Some of the witnesses for the State who testified as to the presence and conduct of defendant at the Byrd Apartments on Sunday, April 9, 1978, said they saw him at the courtyard with his young son Sunday morning; that there was a "cookout" party that afternoon and that defendant and his son and the victim and her daughter, the child who was in the victim's apartment the night of the murder, were at the party; that defendant played with Mrs. Wilcynski's child, and inquired of some at the party as to Mrs. Wilcynski. There was some evidence that he attempted to converse with Mrs. Wilcynski but that she did not talk with him. Captain William Dortch, of the United States Army, a friend of appellant (a warrant officer of the Army) had an apartment at the Byrd Apartments. Defendant was visiting Captain Dortch on Sunday, April 9.
According to defendant's testimony, he was invited by Captain Dortch to stay for the cookout late that afternoon.
*932 Appellant returned to the apartment complex on the evening of April 11. As much of the testimony is merely cumulative as to undisputed facts, no attempt will be made to particularize the testimony of all of the individual witnesses or to name all of them.
Mrs. June Napier, who had seen appellant in the courtyard on Sunday afternoon, testified also that as she was unloading groceries from her automobile on the night of the murder, appellant approached her, picked up a bag of groceries and stated that he would help her take them up the stairs. She said,
"I told him that was all right, that I could get them and he said, `Well, I understand how it is. It's awful hard to raise children alone, isn't it?' and I told him that I wasn't alone.
". . .
"I took the groceries in the house and he just came in with a sack of groceries and put them down and
". . .
"He was talking to me and I can't remember what he was saying, because I was in a hurry and trying to get dinner ready before Vincent [her husband] came home. I was a few minutes late, and my little girl cut her finger. She just came out of the bathroom, and I hadn't put up Vincent's things, and she got a razor blade and cut her finger with it, and he picked her up and took her in the bathroom and fixed it up. Then he was just talking to her and I was putting away my groceries and stuff, and a while later Vincent came in."
Mrs. Napier further testified that while defendant was in the apartment and before her husband returned, she was going "back and forth getting things out of the car and trying to get dinner ready" and that she noticed defendant drinking a bottle of beer. She said that when her husband arrived, a friend, Jeff Parker, was with him and that defendant remained at the apartment and sat down and talked with Mr. Napier and Jeff Parker. She did not stay with the three men but went into the bedroom.
While the door of the bedroom was closed, she heard her husband say, "Don't go in there, because my wife is nursing the baby," and when she heard him say that she "just pulled my blouse down and laid the baby down, and he came in there and put his arm around me, and he said, `Which way is the bathroom.'" She then left the bedroom and went into the room where her husband was, and she assumed defendant went into the bathroom, which other evidence shows that he did.
According to additional testimony of Mrs. Napier, she was not certain as to the time defendant left the apartment of the Napiers'. She remembered that he was still there at 10:00 o'clock, and that she had gone downstairs to get some clothes out of the drier and when she returned he had gone. She said he must have gone "around 10:45, or something like that" or that it "must have been about 10:30." She said that "about a quarter to eleven," while she was returning from her automobile with some clothes of her husband to be washed, and was going up the stairs to the floor of her apartment, she saw defendant near the stairwell across from Mrs. Wilcynski's apartment. While at or near the stairwell he said to Mrs. Napier:
"What hours does your husband work? When can I see you again? What is your phone number?"
Instead of replying to defendant, Mrs. Napier said that she just "went on up the stairs," that "I didn't say anything to him, it scared me." She saw him no more that night.
Mr. Vincent Napier testified that as he returned to the apartment that night, accompanied by Jeff Parker, he saw defendant sitting at the table in the dining room with a beer; he walked past defendant, went to the kitchen and talked with his wife and returned and introduced himself to the defendant. They sat and talked, and Napier and Parker and defendant played dominoes. Mrs. Napier had gone into the back bedroom where the baby was; the defendant went toward the bathroom, and he told defendant to knock on the door, that *933 his wife might be nursing the baby; after two or three minutes defendant came back to the table where they were playing dominoes. He said that about nine o'clock, defendant went for a can opener and returned in about five minutes, that defendant left "around eleven ... maybe a little before or after." His wife returned to the apartment from her trip downstairs to the automobile, shortly after the defendant left.
Captain Bill Dortch testified that he lived on the same floor of the apartment as Mrs. Wilcynski and about three or four apartments from her. He had known defendant in connection with their military work. He had not lived at the Byrd Apartments long. He lived alone. Defendant had visited him the Sunday before the murder and had helped him move to the apartment. On the day of the murder, defendant came to the apartment at about 5:30 P.M. Dortch owned a motorcycle that he "used to store... right under the stairwell." Defendant left Dortch's apartment "around 7:30 or 8:00." He was going to get something to eat, some hamburgers for both of them; he returned "between 8:30 and 9:00" but only stayed a few minutes. Further testimony was as follows:
"Q He came back to your apartment at what time?
"A He came backyou mean after the second time?
"Q Right.
"A That was 10:30, because I was laying on the couch waiting for him to bring the food, and when the door opened I got up.
"Q Is there any special reason that you know it was 10:30?
"A Yeah, because I was lying on the couch and I was expecting hamburgers, and I checked my watch, and I said, `Well, it is kind of late to worry about the hamburgers.'
"Q When he came back at 10:30 what did you and he do?
"A Well, just discussed what he was doing and why he didn't have the hamburgers.
"Q Okay, did youhow many drinks had you had that night?
"A MaybeI would say about two drinks that night, because I wasn't feeling good. That's why I was lying on the couch.
"Q Okay, and you say that Mr. Graham left your apartment some time between 12:00 and 12:30, is this correct?
"A That is correct.
"Q But you are not sure of the time between 12:00 and 12:30?
"A That is correct.
"Q Is there any special way that you could point down that he left your apartment between 12:00 and 12:30?
"A Well, the reason why I say between 12:00 and 12:30 is because after he left, I went in the ice box and got something to eat, and thensee my door was still unlocked, because I didn't walk with him to the door. He just closed the door himself, and after I finished eating, then I went and locked the door and checked the time and it was 12:35. I know it didn't take that long for me to go right to the refrigerator."
At one time during the testimony of Captain Dortch, he said:
"Q Did you go to sleep during the time that he was there and the time he
"A Yeah, I was sleeping part of the time."
Clyde Hamilton, Jr., seven years old, testified that on the night of the murder, while he was looking for his frisbee in the apartment house hallway, he saw defendant come out of an apartment at the same time that Mrs. Wilcynski came out of her apartment and defendant "went up to her and started talking to her, but then when he went up, I left." He didn't know the time that this occurred, but stated it was after dark. Clyde's father testified that Clyde, Jr., was out of the apartment looking for his frisbee from "almost exactly 8:30 by my watch" and came back in about fifteen or twenty minutes with his frisbee. He had previously seen defendant at Byrd Apartments, once at the cookout on April 9 and again in between "7:10 and 7:30" when *934 defendant was "withI don't know the man's name but he was a captain and he lived in apartment 15; a black man, and they were outside, on the sidewalk and I spoke to them as I went by."
John McGraw, who lived in apartment No. 9 next door to Mrs. Wilcynski's apartment, testified that as he returned to his apartment from work "about 10:30" he saw defendant standing in front of the victim's door next to the stairwell talking to some lady. He said the lady was going up the stairs; that defendant asked the lady if she would like to go to "a party or park" but that the lady said "something like, `I will have to ask my husband'"; that the lady went up the stairs.
There were three witnesses as to noises in the victim's apartment on the night of the murder: (a) Mrs. Rose Teich testified that between 11:00 and 11:30 she heard Mrs. Wilcynski scream, a short, sharp scream. She said she screamed about four or five times; that her husband went downstairs to investigate and returned saying "I can't see anything." (b) John Hamby, who also lived in an apartment next to the victim's, testified that about "11:40 or 11:41" he heard noise, a banging, in her apartment, and he thought "somebody was taking a shower in the apartment." (c) A stipulation between the parties was agreed upon and admitted in evidence as the sworn testimony of William Tharp, that "about 11:35 or 11:37" when he returned to his apartment the night of the murder he heard "a long lingering scream next door, then it got quiet."
The victim's mother testified that no jewelry was missing from the apartment after the murder.
A large number of hairs were obtained from the scene of the murder, some from the victim, some from the bed and some from other places in the apartment. Many hairs were obtained from defendant, after he was taken into custody, from various portions of his body. There were also some hairs taken from defendant's dog. State Toxicologist John Kilborn examined the hairs taken from the apartment and the hairs obtained from the head and other areas of defendant and compared the two groups of hairs. He testified in part as follows:
"Q Will you tell the jury the similarities that you found from the known hairs from Richard Graham's head and from the scene; step by step, the things that were identical.
"A Well, out of all the 286 hairs I found, there were 3 that can be identified as Negroid hairs. Two of these are very small and really considered too small to make any type of comparison; only identified the race. The third hair which was submitted, contained in a plastic bag, labeled `from the top sheet,' this hair was compared with the hair of Mr. Graham, found that all of these characteristics were identical. We found that there was a medium type cuticle with ragged scale pattern, and the diameter was identical and the variation in diameter was very little, it was identical between the known and the unknown, the pigmentation of the hairthere extreme clumping of the pigment granules and these granules were located on the edge of the hair. The medulla was absent. There was no evidence of artificial treatment, like dying or bleaching. On the cross section, both hairs were extremely flat, and the pigmentation was identical. In the hair received from the scene, or submitted to me as identified from the scene, hair was not a complete hair, it was a broken hair. There was no root to examine, and the tipthe tip was indeed present, it was very frayed, and I couldn't ascertain whether or not the tip was present.
"Q Then your conclusion of comparison is what?
"A That microscopically the hair identified to me from the top sheet is identical to that of Mr. Graham's head hair."
On cross-examination of Mr. Kilborn he testified that hair can be transferred from person to person and as to the possibility thereof without any physical contact. The latter part of his testimony on cross-examination was as follows:

*935 "Q Johnny, if on 9 April, 1978, Rick Graham had been playing with the child of Donna Wilkinski, is it possible that a hair from his head was transferred to the child, who in turn, transferred it to that apartment?
"A Well, without actual knowledge of the circumstances it would be difficult for me to say. I would once again say that hairs can be transferred.
"Q Johnny, is it possible that this hair came from another individual other than Rick Graham?
"A Yes, sir, this is possible."
M. R. Nowicki testified that he was with defendant on the day before defendant was arrested, which other evidence shows was approximately one week after the murder, at the office of the Ft. Rucker preschool, that they discussed some matters at the preschool with reference to the work there and in the course of the conversation, the witness asked defendant to call him thereafter and defendant then asked for the phone number of the witness. His testimony continued as follows:
"I gave it to him, and he said, `Where is that?', and I said, `It's at the Headquarters Building,' and he said, `Oh, you are up there now?', and I said, `Yes.' He went on to say, `I suppose you have heard my name mentioned up there lately?', I said in a kidding manner, `No more than usual, what did you do this time?' I had not heard anything prior to that time. He said to me, `Well, I am the number one suspect in a murder case in Ozark.'
. . .
"A He further said to me, `I was there.' He paused and he said, `I was at her apartment that night.'"
State Toxicologist Chap McCracken, Jr., who performed an autopsy on the body of Mrs. Wilcynski and testified extensively as to his examination of her body and the scene of the murder, testified also that in the process of the investigation of the murder he examined the automobile that defendant had purportedly driven the night of the murder. As to this, his testimony was in part as follows:
"Q Did you find any bloodstains in Richard Graham's automobile?
"A Yes, I did.
"Q And where did you find them?
"A I found two small red-brown stains on the steering wheel of the automobile. They gave a positive presumptive test for the presence of blood, and small sizes of stains precluded more specific examination.
"Q Could you tell the age of that?
"A They were relatively fresh.
"Q What?
"A Relatively fresh, not ancient.
"Q Did you find any more blood in there?
"A No, sir."
By the testimony of State's witnesses, it was shown that the initial investigators of the crime found a "partial shoe print" on the carpet of the apartment of the victim. The section of the carpet with the partial shoe print was removed and admitted in evidence. As to it, Mr. Dale Carter, a criminalist and director of the Enterprise Laboratory of the Alabama Department of Toxicology and Criminal Investigation, testified:
"A It's a piece of carpet with a partial footprintreddish stained footprint on it.
"Q And do the reddish stains show positive presumptive tests for blood?
"A Yes, sir.
"Q And where did you extract that piece of carpet?
"A It was identified as being from the living room by the wall of the outside window.
"Q Now, on this piece of carpet, did you measure the size of the partial shoe print?
"A Yes, sir, I did as best I could.
"Q Okay.
"A Three and a half inches at the widest and eight and a half at the longest.
". . . .
"Q Now, in your opinion, was this print made by a tennis shoe?
"A In my opinion, this print was made by a shoe having a smooth sole and heel with no pattern.

*936 "Q So then you would further state in your opinion that this print was not made by a tennis shoe?
"A I can't state that because I have seen smooth bottom tennis shoes, even though they are not common. I myself own a pair."
When State Toxicologist McCracken was asked on cross-examination whether the shoe print in the carpet was made by a tennis shoe, he replied, "If it were a flat soled tennis shoe, it could have. They are not common, but they are not uncommon." When asked whether it matched any of the shoes in the apartment occupied by the victim, he said, "I did not see anything it matched."
Mrs. Graham, wife of defendant, testified that her husband came home "around one o'clock" the night of the murder. He ate something and went to bed. She said he had on "a white sweat shirt, a blue jeans, and sneakers" or tennis shoes. She did not wash any of the clothes prior to the time the search warrant was executed; "his blue jeans were still on the bar where he left it at, I did not wash it."; his shirt and his socks were sitting on the table when the search was commenced. She said that one of the officers looked at the same pants he had on the night of the murder. She said that the officers executing the search warrant went "through all of his shoes and all of his clothes and everything." According to her testimony, defendant had not worn the pants introduced in evidence, upon which there was testimony as to blood, in a "long time," that the pants were in a small box sitting in the corner in the kitchen on the floor, when the officers found them, that they were with a bunch of old clothes that she had taken to a garage sale to try to sell and had brought back home. Her husband was not wearing the pants the night of the murder. On the day before the search was made, her husband was in the kitchen cutting a cake and cut his finger. She told him to put a bandage on his finger, but he said, "It will heal faster if you don't put something on it." On cross-examination, she said she did not know whether her husband washed the shirt he wore the night of the murder between that time and the day of the search.
According to the testimony of defendant, he and his son spent most of Sunday morning and afternoon at the Byrd Apartments, where he went to visit Captain Dortch, who asked him to stay over for the cookout. Except in the respect that he claimed that he was not as immodest and extrovertive in his behaviour as some of the testimony for the State indicated, there was no substantial conflict between his testimony and that of witnesses for the State. He said that his son, Christopher, played with "Therese," the victim's daughter. After some time he went outside and played with them and other children. He gave them "pony rides on my knee." He said, "I had my son sitting on one lap and had "Teresa" over here to get her up on the other leg and give them a ride. She didn't want to get up at one time, so I didn't force her." Mrs. Wilcynsky came out and brought some cold drinks for all the children. He had a conversation with Mrs. Wilcynski and asked one of the men he knew about her. He said he left the apartments about 5:00 P.M., which was earlier than some of the witnesses for the State said he left.
According to the testimony of defendant, he arrived at Captain Dortch's apartment about 5:20 or 5:25 P.M. April 11. They sat around and talked until between 7:30 and 8:00. He had had a drink with Captain Dortch. Captain Dortch suggested at that time that defendant get them something to eat. As he went out of the apartment, he saw Mrs. Napier's daughter, Emily, and was having a conversation with her, when he saw Mrs. Napier arrive. He went into detail as to his conversation with Mrs. Napier. He started up the stairs with the bag of groceries and went with her and Emily into the apartment. There was little difference between his testimony and the testimony of Mr. and Mrs. Napier as to what happened at the apartment of the Napiers. He left about 9:00 P.M. to go to Captain Dortch's apartment to get a can opener, and as he left Captain Dortch's apartment with the *937 can opener, he saw Mrs. Wilcynski at the stairwell next to her apartment. He mentioned to her about the good time that his son had had playing with Mrs. Wilcynski's daughter the preceding Sunday. He said he did not go into Mrs. Wilcynski's apartment but went directly back to the apartment of the Napiers. He left that apartment again "shortly after 10:00." While going to Captain Dortch's apartment, he saw Mrs. Napier coming into the apartment building near the stairwell next to Mrs. Wilcynski's apartment and had conversation with her for a few moments and went to Captain Dortch's apartment and stayed there until "about 12:30." There was little difference between the testimony of defendant and that of Mr. Nowicki as to the conversation between the two. The defendant knew at that time that he was a suspect; his house had been searched and he had heard his name called in connection with the murder. The chief difference in his testimony and that of Mr. Nowicki was that defendant said that he had been at the "apartments where she lived on that night," instead of "at her apartment."
According to further testimony of defendant, he wears a "size 10 or 10 ½" shoe. The shoes he had on at trial were eleven and five-eights inches long and four inches wide on the outside. On the night of the murder he had on a white sweat shirt, with the emblem "U. S. Army Aviation School" on it, a pair of athletic shorts with a similar emblem on the corner in white print and a pair of black and white sneakers, or "tennis shoes, or gym shoes, or whatever you call them." He exhibited to the jury his finger that he said he cut with a knife on Thursday morning after the murder. He did not put a bandaid on it right away but did after he saw that it wasn't going to stay closed. When the officers came out and searched his house they looked at about everything there, about all his clothes, "at least one of every pair of my shoes," took them out to the driveway and examined them and then started "bringing it back in one by one after they were satisfied with it, until they finally got to that light pair of pants that they found in the kitchen." They had obtained the pants from a box in the kitchen with a bunch of old clothes. His testimony as to them was substantially the same as that of his wife. He had not worn the particular pants, according to his recollection, since about six months or a year prior to the murder.
Defendant moved for an exclusion of the evidence at the end of State's evidence, requested in writing and was refused the general affirmative charge in the defendant's favor at the conclusion of all the evidence, and filed a motion for a new trial, which the trial court overruled. There seems to be little difference of view between the parties as to the applicable principles to be applied as to the sufficiency of the evidence to justify denial of a motion to exclude the evidence, the refusal of the general affirmative charge requested in writing, or the denial of a motion for a new trial presenting an issue as to the sufficiency or weight of the evidence. The difference between them is as to the application of those principles to the evidence in this case, each arguing for his [its] side of the issue, without reference to any precedent in which the evidence was similar or the circumstances comparable.
In most cases in which there is a serious dispute as to the sufficiency of the evidence to support a guilty verdict, there is a sharp conflict in the evidence as to material facts, some of the witnesses swearing one way and others another. In such cases, the task of an appellate court is generally easier than otherwise, for it can then lean more comfortably upon the responsibility of the trial court, as well as the trial jury, both of whom are in a better position to determine which witnesses have testified truthfully and which falsely. We do not have such a situation in the instant case, in which there is little, if any, material conflict in the evidence.
On the question of the guilt or innocence of defendant of the crime charged, the evidence against him is entirely circumstantial; the evidence in his favor is both direct and circumstantial. It is a mistake, a common one, to denigrate the nature of circumstantial *938 evidence by considering it as inferior to direct evidence. That fallacy has been denounced, with the clarity of a clarion, by some of the greatest judicial minds of Alabama, state and federal, speaking from a wealth of wisdom and experience. Included, in the sequence of their statements, are Judge Seybourn H. Lynne, in United States v. Bostwick, N.D.Ala. (on appeal at 5 Cir., 218 F.2d 790); the late Judge Aubrey M. Cates, Jr., in Sumeral v. State, 39 Ala.App. 638, 106 So.2d 270; Judge J. Russell McElroy, as now found in the third edition of his treatise on Alabama evidence, Gamble, McElroy's Alabama Evidence, § 212.01, and Judge John O. Harris, now our Presiding Judge, in Creel v. State, 53 Ala.App. 504, 301 So.2d 267, and subsequent cases.
In comparing the relative strength of circumstantial and direct evidence and in declining to give preference to either, the reference is to the two kinds of evidence in general. It is axiomatic that in some cases the direct evidence may be stronger than the circumstantial evidence therein and in other cases the circumstantial evidence may be stronger than the direct evidence therein. At times, where there are both kinds of evidence that are irreconcilable and lead to opposite determinations as to the truth that is proved by the evidence taken as a whole, either direct evidence or circumstantial evidence may prevail over the other. To say that each "is entitled to the same weight" as the other is not to say that in every case each has the same weight as the other. It can be readily seen that circumstantial evidence can be more credible than direct evidence, for circumstances, when shown to be true, are disinterested and unbiased, while direct evidence must come from witnesses who are often either interested or biased, or both, or for other innate human weakness are unreliable in purportedly stating what they have seen or heard. Circumstantial evidence is often strong enough to so discredit direct evidence as to show that the direct evidence is not true, whether intentionally or mistakenly untrue. But if there is true direct evidence, such as truthful testimony of a witness that he, in fact, saw a person commit a crime, such testimony is not vitiated by circumstantial evidence, however unquestionably true it is and however strong it may be to the contrary. To conclude otherwise is to defy the principle that truth is never inconsistent with truth.
The foregoing considerations lead us to special consideration of direct evidence in the case that is in conflict with strong circumstantial evidence of defendant's guilt. We should, and we do, in our general consideration of the evidence, include the direct evidence of defendant that is diametrically opposed to a conclusion of guilt, but for the special consideration of this time we refer particularly to the testimony of one of the witnesses for the State, Captain Bill Dortch.
In its argument in its brief on appeal as to the testimony of Captain Dortch, appellee states:
"Bill Dortch stated that Appellant returned to his apartment at approximately 10:30 p. m. and stayed until 12:00 or 12:30 a. m. Dortch also testified that he was sleeping during part of this time. Appellant, in his brief, maintains that this testimony established his alibi. This testimony, however, was contradicted by Mrs. Napier, who stated that she encountered the Appellant at 11:00 p. m. while she was returning from her car...."
Although Dortch's answer to one question asked him on direct examination could understandably lead to the conclusion reached in the second sentence of the above quoted statement in appellee's brief, such conclusion is shown to be incorrect by a consideration of his testimony as a whole. By this it is not meant that there was any conflict in his testimony, merely that an answer of the witness, when considered in connection with the question asked him, was ambiguous, which ambiguity was clarified by other testimony of the witness. We have hereinabove set forth the particular question and answer and now repeat it:
"Q Did you go to sleep during the time that he was there and the time he
"A Yeah, I was sleeping part of the time." *939 It is to be observed that the witness by his answer interrupted counsel before he had completed the question. The witness obviously jumped at his conclusion as to what was meant by the question, which conceivably could be reasonably interpreted as appellee has done, but for other testimony that leads to a different conclusion:
"Q Okay, did Mr. Graham, between 10:30 and whatever time he left, did he leave at any time when he was in your apartment?
"A No.
"Q Were you and him carrying on a conversation the whole time?
"A Yes, sir.
"Q Were you looking at him this whole time?
"A He was physically there.
"Q And you were not asleep any of this time between 10:30 and 12:00?
"A When he came in the door, he woke me up.
"Q Between 10:30 and the time he left your apartment; you testified to between 12:00 and 12:30, not leave your apartment between 12:00 and 12:30.
"A That's correct."
The weakness of alibi testimony generally has been perennially considered. In many, if not most, cases there was such uncertainty or vagueness about the time of the crime or the time of the presence of defendant at another place that it could reasonably be said that he could have been at the place of the crime at the time of its commission. In many of the cases witnesses testifying as to an alibi were closely related to defendant and their interest in the outcome tended to discredit them. In almost all of such cases, the witnesses were not witnesses called by the State.
The fact that Captain Dortch was called by the State as a witness does not in and of itself make his testimony any more credible than if he had been called by defendant, but it is a factor to be considered, along with all the other evidence and the respective contentions of the parties. It is to be seen that appellant's argument to the discredit of his alibi testimony is not correctly premised. Different from most cases in which an alibi is claimed and supported by considerable evidence, it seems to us that we are here faced with the positive testimony of a witness which, if true, establishes the presence of defendant at an apartment different from the one in which the murder was committed at the same time the murder was committed, and that fact would establish his innocence. It seems to us that the most reasonable conclusion to reach from the testimony of Captain Dortch is that defendant was not in the apartment of the victim of the murder at the time she was killed and, therefore, he did not kill her, or that Captain Dortch knowingly testified falsely. Whatever our individual thoughts may be on the subject, the record in and of itself, to which alone we can look, does not support the latter alternative. We view his evidence as strongly in favor of defendant on the merits of the case. There is nothing in the evidence or in the briefs of parties to lead us otherwise. We would not be justified in looking elsewhere for an answer.
One of the grounds of the motion for a new trial referred to the evidence as to part of a hair from the bed of the victim that expert testimony showed had the same physical qualities and characteristics as hair from defendant's head. The Court in its order overruling defendant's motion for a new trial said:
"The Court will take judicial notice of the scientific fact that a positive identification cannot be made by comparing a hair sample of an unknown origin with a hair sample of known origin. However, hair does possess a unique series of characteristics and a disputed hair can be compared for similarities with other human hair whose origin is known. Therefore, the Court finds that it was competent for the State Toxicologist, who was familiar with and an expert on the properties of human hair, to testify as to his analysis of the hair found at the scene of the crime and the hair taken from the body and head of the defendant."
Though there was some value to the State in the testimony as to the resemblance of a *940 piece of hair taken from the bed of the victim and hair from defendant's head, it seems that it is not questioned that "positive identification" of defendant was not made by that comparison. It seems to us that neither side gained much by such testimony, even though each side gained some. The gain for the State is emphasized by the State's insistence as to the amount of its value as evidence. On the other hand, there is something to be said for the fact that out of the large number of hairs that were taken from the scene of the crime, there was only one piece of a hair tested that resembled defendant's hair and that only three hairs were Negroid. Moreover, the presence of a piece of defendant's hair in the bed of the victim is not irreconcilable with his claimed innocence, when due consideration is given to the undisputed evidence that defendant had played with the victim's three-year-old child two days before the murder.
The evidence as to small stains on the steering wheel of defendant's automobile a few days after the murder that "gave a positive presumptive test for the presence of blood" is heavily relied upon by appellee, as it doubtless was on the trial. The toxicologist said that the "small sizes of stains precluded more specific examination," that the stains were relatively fresh. Whether fresher than the blood of the victim murdered two days before, there is no evidence.
Appellee also refers to the blood upon a leg of appellant's pants as evidence in its favor. It is a circumstance calculated to be in favor of appellee when considered in connection with all the other evidence, but we find no answer to the position taken by appellant that the particular trousers were not the trousers that were worn by him the night of the murder. Whether true or not and whether strong or not, the evidence is undisputed that he was wearing shorts.[1] Not only did he say so, but Clyde Hamilton, Jr., when questioned about seeing defendant talking with Mrs. Wilcynski at the door of her apartment, testified:
"Q Clyde, you say you saw him talking with her there at the door, and you didn't see him go in, did you?
"A (Shaking head negatively).
"Q Did you see Donna when she came walking around the apartment?
"A No, she came out and she had short cut pantsLevis, she cut them and I didn't know where she was going.
"Q And what did this man sitting here have on, do you remember?
"A He had short blue pants, and I don't remember what kind.
"Q Do you remember his shirt? Was it a white shirt, a sweat shirt, do you know what I mean?
"A Yeah, but it wasn'tI don'tit was a short sleeve shirt, you know, what you said, but I don't know what color it was."
On the subject of the clothing worn by defendant the night of the murder, the following testimony was given by Mr. Vincent Napier, with whom defendant spent considerable time:
"Q Okay, what kind of clothes was Mr. Graham wearing that night?
"A He had a sweat shirt, and maybe jeans or something casual [which we interpret casual]. I'm not sure. He was dressed like he might have been working out or something.
"Q Okay, do you recall if he had on jeans?
"A No, I couldn't say jeans orI'm not for sure.
"Q What about his shoes?
"A No, sir.
"Q But you say you do remember he looked like he had been working out or jogging?
"A Something like that, or exercising.
"Q Those are the type of clothes he had on that night?
"A Yes, sir."
The jury was entitled to the evidence presented to it as to that which stood the presumptive test as to blood on the steering wheel and on the trousers, but in our effort *941 to determine whether the evidence is sufficient to meet the test to which it must be subjected on this appeal, it is our view that it is not strong. This in light of all the evidence but without giving much weight to the evidence as to defendant's having cut his finger as constituting the source of any blood upon his trousers.
Although the prosecution obtained an order of court requiring fingerprints of defendant that were made, there is no evidence tending to connect defendant with the crime by any of the numerous fingerprints lifted from the scene of the crime.
No effort is attempted to be made to explain the presence of the partial footprint on the carpet of the victim's apartment. To say that it was defendant's would be purely a guess. The evidence indicates, although it does not conclusively show, that it was not.
We conclude that there is much circumstantial evidence to support the verdict. A determination of its exact weight as compared with direct evidence, and some circumstantial evidence, to the contrary, may be extremely difficult, but it cannot prevail unless it is so strong that it cannot reasonably be reconciled with the theory that defendant is innocent. It is not sufficient to support a conviction if it does not exclude to a moral certainty every other reasonable hypothesis but that of the guilt of the accused. Failure to meet that test resulted in a reversal in Sumeral v. State, supra, and such test has heretofore been uniformly applied. Ellison v. State, 254 Ala. 428, 48 So.2d 176 (1950); Burgett v. State, 37 Ala.App. 469, 70 So.2d 429 (1954); Byrd v. State, 37 Ala.App. 121, 73 So.2d 376, cert. denied 261 Ala. 697, 73 So.2d 378 (1954); Whatley v. State, 37 Ala.App. 706, 75 So.2d 182 (1954); Bluth v. State, 38 Ala.App. 692, 92 So.2d 685 (1957); Smith v. State, Ala.Cr.App., 342 So.2d 422 (1977).
We would be required to say, as difficult as it may be to do so with satisfaction, whether there was sufficient evidence to warrant a refusal of the general affirmative charge in favor of defendant, if there had been no motion for a new trial raising the question of the sufficiency of the evidence. As there was such a motion for a new trial and it was overruled, we need only apply the test whether, after giving the learned trial judge the favorable presumption that is due him, the verdict is so contrary to the weight of the evidence that it is clear that it is palpably wrong or unjust. Skinner v. State, 22 Ala.App. 457, 116 So. 806 (1928); Davis v. State, 33 Ala. App. 299, 34 So.2d 15, cert. denied, 250 Ala. 240, 34 So.2d 17 (1948); Barker v. State, 55 Ala.App. 322, 315 So.2d 129, cert. denied, 294 Ala. 752, 315 So.2d 130 (1975); Smith v. State, Ala.Cr.App., 342 So.2d 422 (1977).
The test we are to apply is not whether we think that appellant is guilty. A verdict finding a defendant guilty in a criminal case is wrong and unjust, even though defendant is guilty, if the evidence of his guilt is not strong enough to meet the legal test required as stated above. Such a verdict, when properly challenged, cannot stand, even though there is strong reason to believe that if all of the true facts were known and shown in evidence guilt would be conclusively established.
After giving the trial court the favorable presumption to which it is entitled, we conclude that, irrespective of whether appellant is guilty, the verdict is so contrary to the weight of the evidence that it is clear that the verdict is palpably wrong and unjust. By so holding we do not say that there is disagreement between us and the jury as to the guilt of defendant, but that the verdict is palpably wrong and unjust by reason of the extent of its contrariety to the weight of the evidence now before us. The defendant's motion for a new trial should have been granted.
The foregoing opinion was prepared by Retired Circuit Judge LEIGH M. CLARK, serving as a judge of this Court under the provisions of § 6.10 of the New Judicial Article (Constitutional Amendment No. 328). His opinion is hereby adopted as that of the Court. The judgment of the trial court is hereby reversed and rendered.
REVERSED AND RENDERED.
*942 HARRIS, P. J., and BOOKOUT and BOWEN, JJ., concur.
TYSON and DeCARLO, JJ., dissent.
TYSON and DeCARLO, Judges, dissenting.
While we agree that the evidence in this cause against the appellant is largely circumstantial, nevertheless we are of the opinion that the evidence is sufficient to support the verdict.
NOTES
[1] The writer has examined the exhibit that constitutes the pants upon which the stain of blood was found. They are ankle-length and are labeled, "100% polyester."