Appellant-defendant was indicted for possession of marijuana and was found guilty of possession of marijuana for his personal use. The one is a felony, the other a misdemeanor. Code of Alabama 1975, § 20-2-70. The jury fixed his punishment at a fine of $200.00; the court imposed additional punishment of imprisonment in the county jail for twelve months and sentenced him accordingly.
On October 25, 1979, officers obtained a search warrant to search 215 West North Street, Dothan. When they arrived Cathy Russaw and a couple of small children were there. After a short time from the commencement of the search, the defendant came to the house. The building at 215 West North Street was owned by and was physically connected to Hawk's Funeral Home, which apparently had an address on another street. There was some testimony that a girl by the name of Dorothy Poke was living at the house. Pursuant to the warrant, the officers conducted the search about 3:30 P.M. on the day the warrant was obtained. In the course of the search, marijuana was discovered and seized. There was evidence, in addition to that narrated above, pertinent to the question of the validity of the search warrant which need not be stated, as the only point made by appellant as to the validity of the warrant and the search made pursuant to it is to the effect that, under the circumstances in the case, the description of the building or place to be searched as 215 West North Street, Dothan, Alabama, was insufficient. Pursuing the point, he stresses the fact that the particular building was physically connected with Hawk's Funeral Home and relies upon United States v. Hinton, 219 F.2d 324 (7 Cir. 1955) and Hutto v. State, 50 Ala. App. 636, 282 So.2d 75. In Hinton
the property was described by street number, at which described place was a building with four separate residential units. InHutto the premises were described by a number on a named street in Auburn, Alabama, and as a white block building on the southeast corner of the intersection of the named street and a named avenue in the same city. The court said at 282 So.2d 81-82:
 "It is apparent that the premises in question were being occupied by both commercial and residential tenants. The officers seeking the search warrant and the Inferior Court Judge issuing the warrant were aware of this. It is equally clear that the building in question was not being used as a `one family residence' and that the person named in the affidavit and warrant was the `original lessee' who no longer occupied any of the premises, and in fact such had been subleased. It is therefore clear that the affidavit and warrant are both invalid as failing to provide a more definite description of the subunit of the building sought to be searched, or of the room number within the said premises sought to be searched. Moreover, neither the affidavit nor warrant identifies the premises as being under the control of either the appellant or of the sublessee who in fact had control of the whole premises. Because of these deficiencies, we are of the opinion that the trial court committed error in not granting the motion to suppress the affidavit and warrant. See Annotation, 11 ALR.3d 1330, et seq."
The building and premises searched and described in the affidavit and warrant in the instant case cannot be likened to the building and premises involved in either Hinton, supra, orHutto, supra. On the contrary, in the instant case the only physical connection between the building that housed the funeral home and the building searched and described as 215 West North Street, Dothan, Alabama, was the outside *Page 1080 
structure or connecting wall between the two buildings. There was no inside hall, stair, or other passageway between the two buildings. The building searched was not a plural-unit building. The evidence shows that it was designed and used as a single-unit residence, even though there is evidence to the effect that it had been used for traffic in drugs. The trial court was correct in overruling defendant's motion to suppress the evidence of the fruits of the search.
A more difficult question is presented by appellant's only other insistence on a reversal in which he urges that the trial court erred in overruling defendant's motion to exclude the State's evidence that he submitted when the State rested, in refusing defendant's affirmative charge written after all evidence had been introduced, and in overruling defendant's motion for a new trial. There was hardly any dispute in the evidence; some of it has already been summarized. Appellant does not contend that marijuana was not found in the building at 215 West North Street; he contends that he did not possess it.
At the time the motion to exclude the State's evidence was submitted, the only evidence, if any, tending to connect defendant with the possession of the marijuana, consisted of the testimony of Officer Lamar Hadden, an experienced employee of the Alabama Beverage Control Board. He testified that he and Agent Blount arrived at 215 West North Street about 3:30 P.M., October 25, 1979, and served the search warrant on Cathy Russaw. Defendant was not there at the time but the witness saw him "across the street, in front of the Capri Club." After serving the search warrant, the witness went to the living room, "checked all the rooms first to see if anybody else was there," came "back up into the back bedroom and looked in it and couldn't find anything" and then "went to the front bedroom." While making the search in the front bedroom, he found "a woman's purse or just a tote bag" and in the purse he found some "Middleton Cherry Pipe Tobacco, a five dollar bag of marijuana" and "some keys." Defendant had come into the house about "ten or fifteen minutes" after the officers arrived at the house, but he stayed in the living room while Officer Hadden conducted the search in the bedrooms. After fully warning and advising defendant and Cathy Russaw as to their constitutional rights, they interrogated defendant as to the contents of the purse or "tote bag." The witness further testified:
 "A. The purse in one hand and all the contents were still in the little bag. And I pulled the tobacco out and asked whose it was and Frank [defendant] said it was his tobacco. And I pulled the brown paper sack out of there, the brown bag, envelope [which contained marijuana] and asked him whose that was. And he said I don't know.
"Q. Did you ask Cathy Russaw?
"A. Yes.
 "Q. Did you ask either one of them whose purse it was?
"A. No. I don't think I did."
Officer Hadden further testified that after confronting defendant with the purse and its contents, he left defendant and went to the back part of the house, searched in the kitchen and found four small bags and their contents like the bag and contents found in the purse or "tote bag," in the top part of a "hot-water heater." The heater was about three feet high; the lid of the heater was loose, and he found the bags and their contents underneath the lid when he lifted it. Upon asking Cathy Russaw and Frank Collins about what he found in the heater, they "denied knowing anything about it."
According to further testimony of Officer Hadden, he had watched the particular house for about two weeks before it was searched. During that time he saw defendant "go to and from the house" several times. He also saw "a lot" of "other people come and go from this house." Men's clothing, as well as women's clothing and children's clothing, was in the house. A .22 caliber sawed-off rifle was in the house. There was no marijuana smoke or odor in *Page 1081 
the house that the witness could detect. Defendant was asked if he "stayed" at the house, and his response was that he did. Before the officers left the house, they placed defendant and Cathy Russaw under arrest. As they were all leaving the house, the defendant stated that "he had to get the keys if they were going to lock the house up." Thereupon he went to the purse or "tote bag" and obtained the keys that were in the bag, put the keys in his pocket and locked the front door. It was a padlock on a hasp, for which no key was needed to close the lock.
At the time the State rested, there was some evidence that either Cathy Russaw or defendant knowingly possessed the bag of marijuana found in the purse. The two had been indicted jointly, but the instant case was severed from the case against Cathy Russaw. It seems that if the two defendants had been tried jointly, neither would have been entitled to a favorable ruling on a motion to exclude the evidence. A prima facie case would have been presented against both, even though the evidence would have been weak and inconclusive as to each. Similar reasoning leads to a belief that the court was not in error in overruling defendant's motion to exclude the evidence.
Defendant did not rest his case until after he, his mother and Cathy Russaw had testified. Whether true or not, their testimony was undisputed and shed light not previously seen on the question of the identity of the person or persons who possessed the marijuana.
The defendant testified that on the afternoon of October 25, 1979, he was at a club across the street from 215 West North Street when his attention was called to two men entering the house. He said he lived there "every now and then, you know." Someone told him that one of the men that entered the house was a narcotics officer. In about five minutes, he went over to the house. He denied knowing that there was any marijuana in the house at the time. He admitted having smoked marijuana at times with Cathy Russaw. He said that one of the officers showed him Cathy's pocketbook and asked him if the marijuana that he found there was defendant's. He further said:
 "Q. Did you say the marijuana was yours or was not yours?
 "A. I said it wasn't mine. He asked me did I know whose it was and I said naw.
 "Q. Do you know if there was any marijuana in that house?
"A. No, I didn't."
He also said that when Officer Hadden asked him if the tobacco that was in the pocketbook was his, he answered that "it wasn't." He said he smoked cigarettes and sometimes cigarettes would contain pipe tobacco. He said that he slept in the room where the marijuana was found on the night before. He denied that he obtained any keys from the purse and locked the door to the house after he and Cathy were arrested. He said there was no key or lock to the house.
Cathy Russaw testified that she was living and renting the premises at 215 West North Street on October 25, 1979; that a girl named Dot Poke, eighteen years of age, also lived there. She said that defendant was not living there, but that occasionally he would spend the night with her; that he did not have a key to the house; that when the officers arrived no one was in the house but the witness and her two children. She testified:
 "Q. Okay. Where was your purse? Do you know where your purse was at the time that the officers found it?
"A. Yes. Laying on the end table in our bedroom.
"Q. Okay. Was there some marijuana in that purse?
"A. Yes.
"Q. Was it yours?
"A. Yes.
 "Q. Did you see the police officer later find four packages, four small envelopes in the kitchen in the house?
 "A. I didn't see them find it, I was sitting in the front room.
"Q. Did he tell you that he found it? *Page 1082 
"A. Yes.
"Q. Do you know where those packages came from?
"A. No.
 "Q. Okay. Did he show you any green vegetable material or marijuana?
"A. No.
 "Q. Okay. Did, to your knowledge, did Frank know anything about the marijuana that was in the house?
"A. No, sir. Not that I know of.
 "Q. Did you admit your guilt to possession of marijuana for your own personal use in this case?
"A. Yes, sir.
"Q. Did you agree to pay a two hundred dollar fine?
"A. Yes.
 "Q. Have you ever seen Frank Collins sell any marijuana or any controlled substance?
"A. No."
On cross-examination, she testified:
"Q. Did he ever have any tobacco over there?
"A. We had some tobacco.
"Q. What kind of tobacco?
"A. I don't remember the name of it.
"Q. Didn't he have some?
"A. Pipe tobacco?
 "Q. Yes. Did he? Didn't he have some Middleton Cherry Blend Pipe Tobacco?
"A. The tobacco belonged to me.
"Q. The tobacco belonged to you?
"A. Right.
 "Q. All right. Let's go to the night of October 24. Did he spend the night with you that night before the arrest?
"A. Yes, he did.
 "Q. Okay. Did he stay over at your place that day, the day of the arrest?
"A. No, he didn't.
"Q. When did he leave?
"A. He left that morning.
"Q. About what time?
"A. It was about 7:30.
". . . .
"Q. Was he across the street that morning?
"A. I don't know.
 "Q. He was across the street that afternoon though, wasn't he?
"A. Yes.
 "Q. Okay. And he had been across the street for some time that afternoon prior to the officers coming? Is that right?
"A. Yes.
 "Q. Okay. Since shortly after noon time, is that about right?
"A. Yes.
". . . .
"Q. Didn't Frank say that it was his pipe tobacco?
 "A. I don't remember saying anything. I wasn't paying any attention.
 "Q. Do you remember the officer asking who owned the marijuana?
"A. Yes.
"Q. Do you recall that Frank said that it was not?
"A. Yes.
"Q. And do you recall that you said that you did not?
"A. Yes.
". . . .
 "Q. And when you all were arrested and Frank . . . you all got ready to leave Frank went back in and got the keys out of that tote bag, didn't he? and locked the house up?
"A. I didn't have any keys.
"Q. Do you deny that?
 "A. I didn't have a lock then. I had lost it. And I usually left my door open for my roommate, because she didn't have a key, either.
". . . .
"Q. Where had you gotten that marijuana from?
"A. That I had in my purse?
"Q. Uh-huh. That you said was yours?
"A. I bought it out there in the street.
". . . .
"Q. Who did you buy it from?
"A. I don't remember his name.
 "Q. How long before October 25th did you buy this marijuana?
"A. I had just bought that that night. *Page 1083 
". . . .
"Q. How many marijuana cigarettes do you smoke a day?
"A. I smoke about two a day.
"Q. Two a day?
"A. Uh-huh.
"Q. Does that keep you pretty high?
"A. Yes, sir."
The mother of defendant had no personal knowledge of what occurred at 215 West North Street. Although she lived within a block of it, she had never been in the building and was not acquainted with Cathy Russaw. She testified that in September 1979 defendant and his wife separated. She said:
 "Q. After the separation, did he start living with you?
"A. Yes. He moved back home.
 "Q. Okay. And has he been living in your house ever since that time?
"A. Well, partly.
 "Q. Okay. Now, has he left his clothes there and all his belongings?
"A. They are still there.
"Q. In October, did he have his belongings there?
"A. Yes.
 "Q. Okay. Now, in September, did he start staying all night there at your house with you?
"A. Yeah, for a while he did.
 "Q. Okay. For a while. After that, did he start staying out some nights?
"A. Yes.
". . . .
"Q. But, he kept all of his belongings at your house?
"A. Yes.
"Q. And he got his mail there, didn't he?
"A. Yes.
". . . .
 "A. He comes every day and changes clothes, takes a shower and changes clothes. Sometimes I be at work, but when I would come in from work, I would notice he had come in and took a shower and changed. I did his washing.
 "Q. Every last bit of clothing he had was at your house in October we are talking about?
 "A. I think so, because they are hanging in the closet now.
 "Q. Now, October 25th, that was the day he was arrested. Do you remember that day?
 "A. Yes, I remember that day. He was there with me all day that day. But, he had been left I guess about forty-five minutes when he called from downtown. He had been arrested.
"Q. What time did he call from downtown?
 "A. Well, I'm not for sure, but it was after 4:00 o'clock, I know.
". . . .
 "A. He wasn't working then. He was working, you know, the first of October and off and on. You know, because he got hurt on the job and he was off of work.
". . . .
"Q. Do you work during the day?
 "A. Yes. But, I was sick that week and I didn't work that week.
"Q. Did you feed him every day?
"A. Yes, still do. Still do.
 "Q. Do you happen to remember that specific week, October 25th, if he stayed or spent the night at your house once, twice or no times?
 "A. I don't think he did. I don't remember. I don't think so.
"Q. Did he ever tell you where he was staying.
"A. No.
"Q. Did he ever tell you who he was seeing?
"A. No. I never asked him.
". . . .
 "Q. Were there other weeks that he would stay the whole week?
 "A. No. He never stayed a whole week at my house, you know, the whole week. In the first of September he did, but in October he didn't stay, you know, the whole week."
There was unquestioned documentary evidence that on August 27, 1979 Cathy Russaw *Page 1084 
paid the city of Dothan the sum of $50 as a deposit for "water, lights, power or current consumed" and that she continued as a customer of record until February 1980. The trial was in March of that year.
We must conclude from all the circumstances stated that the status of the defendant as to the premises upon which the marijuana was found was not that of one in exclusive possession or control thereof and that there can be no reasonable imputation to him of the kind of possession or control that is often imputed to a husband or father as the head of a household.
The appellee contends: "The evidence shows that Appellant exercised the dominion and control necessary to prove his constructive possession of the marijuana. . . . Appellant asserted control over both the premises and the marijuana." We do not agree. In support of the contention, appellee relies upon Cook v. State, Ala.Cr.App., 341 So.2d 183, 184 (1977), in which it is stated.
 "It is obvious that the appellant was not in actual possession of the contraband. The State argues that the appellant had constructive possession of the substances. Three elements essential for proof of possession of contraband are set out in DeGruy v. State, 56 Ala. App. 521, 323 So.2d 406, cert. denied, 295 Ala. 399, 323 So.2d 411 (1975). These elements are:
 "`. . . (1) actual or potential physical control
(2) intention to exercise dominion and (3) external manifestation of intent and control. . . .'"
It is obvious in the instant case that defendant did not have the actual physical control of any of the five bags of marijuana involved in this case.
In arguing that defendant had potential physical control, the intention to exercise dominion and that there were external manifestations of intent and control, appellee states:
 "Prior to the day of the arrest, State ABC agents observed on several occasions the Appellant going into or coming from the premises where the drugs were found. . . . Agent Hadden saw him standing in front of the Capri Club across the street. Ten or fifteen minutes after the search commenced, Appellant went into the house without being beckoned by Agent Hadden or Ms. Russaw. . . . The fact that he went into the house without having been summoned manifested his intent to exercise dominion and control."
Argument is reasonable that evidence to the effect that for about two weeks prior to his arrest appellant had been observed on several occasions going into or coming from the premises would under some circumstances, circumstances entirely different from those shown by the undisputed testimony of witnesses for the defendant, furnish the basis for an inference that he had "potential physical control" of the premises and property therein, whether legal or contraband, but from the evidence as a whole in the instant case there is no reasonable basis for such an inference. The fact that he exercised control over Cathy Russaw at times in the special repeated relations shown by the evidence was not necessarily a concomitant with the control by him of her as to anything else that she possessed or as to any other activity in which she engaged. It is likewise not reasonably tenable, we think, that defendant "manifested his intent to exercise dominion and control" by his standing in front of the Capri Club across the street when the officers arrived and after about ten or fifteen minutes he went into the house without being beckoned by Agent Hadden or Ms. Russaw. Appellee further says that appellant's action in getting the keys from the "tote bag" and locking the house "demonstrated his potential control over the marijuana and his actual control over the premises." These items emphasize appellant's continuing special interest in Ms. Russaw, but they do not extend the borders of that special interest.
Appellee further states:
 "Appellant's status on the premises was not left to conjecture."
We agree. He was neither a tenant, a joint-tenant, a boarder, a roomer, a business visitor nor a trespasser. He was a bare licensee and was limited in control and dominion to the area of his license. *Page 1085 
Our attention has not been called by either party to any case that can be said to be a certain precedent for a definite determination of whether the evidence as a whole was sufficient to justify the submission of the issue of guilt vel non to the jury. However, of great value on the question is the opinion of Judge Bowen in Temple v. State, Ala.Cr.App., 366 So.2d 740
(1979), wherein he sets forth the controlling principles of law and a review of a substantial number of cases that make clear the solid establishment of such principles. Both parties call on Temple, supra, for support of their respective contentions.
In Temple, supra, the controlled substance (cocaine) was found in a packet in the freezer compartment of the refrigerator in defendant's home while defendant was at work. The defendant testified that he had no knowledge of the presence of the cocaine, that his kitchen had been recently remodeled and that several workmen had access to the refrigerator. The case is a precedent, we think, for holding that a jury question was not presented in the instant case as to the four packets of marijuana found in the top of the hot-water heater in the kitchen. There is no evidence whatever that the appellant herein had access to the area of the kitchen, particularly the hot-water heater therein. As to that marijuana, the State's case fails utterly.
As to the packet of marijuana found in the purse of Ms. Russaw on the table in the bedroom that had been jointly occupied by her and the appellant the night before, there is an obviously closer connection with appellant than that of the marijuana found in the hot-water heater, but, as previously indicated, the direct evidence as to the question of his knowledgeable possession of the marijuana in the purse was all in favor of defendant. Furthermore, there was some circumstantial evidence in his favor. The particular packet of marijuana, as well as the four packets in the hot-water heater, was sealed. None of that marijuana had ever been used. The evidence to the effect that defendant had smoked marijuana with Ms. Russaw cannot be correctly directed to the marijuana to which the prosecution is referable. Undisputed evidence was to the effect that there was no odor of marijuana on the premises when the search was made; no ashes, no litter, no telltale signs of smoking of marijuana by defendant and Ms. Russaw were observed. But for evidence for the State, which defendant denied, to the effect that defendant admitted that the tobacco in the purse was his and that defendant took keys to the house from the purse and locked the door as he and Ms. Russaw were escorted therefrom, the conclusion follows, we think, that a jury question as to defendant's guilt was not presented and that he would have been entitled to the affirmative charge in his favor. No such reasonably certain conclusion, however, can be reached upon a consideration of that particular evidence, which appellee contends constitutes incriminating circumstances that together with the other evidence in the case justified a refusal of the requested affirmative charge in favor of defendant. We are not now required, however, to decide that question, as shown by that which follows.
Defendant's motion for a new trial should have been granted, in our opinion. It was filed on April 10, 1980, within thirty days from the judgment of conviction and sentence, was duly continued for hearing to May 5, 1980, and on that date it was overruled. However correct the contention of the State as to the sufficiency of the evidence to justify a submission of the issue of guilt to the jury, the weakness of the State's case is manifest. By this it is not meant that defendant was innocent of the possession of marijuana at times when he was in the premises at 215 West North Street while staying with Cathy Russaw there, but he is not guilty in the instant case unless he knowledgeably possessed the particular packet of marijuana that was found in Cathy Russaw's purse. As to such marijuana, the State has charged in the indictment that he and Cathy Russaw possessed it. She has admitted that she did so, and she has pleaded guilty to the misdemeanor *Page 1086 
of possession of marijuana for personal use.[1]
Although there was a conflict between the evidence for the State and the evidence for the defendant as to whether defendant denied his ownership of the tobacco found in the purse and as to whether he took the keys out of the purse and locked the door, such conflict is not sufficient to justify an affirmance of the judgment. After giving the trial court the favorable presumption to which it is entitled in overruling defendant's motion for a new trial, we are convinced the verdict of the jury is so contrary to the weight of the evidence that it is palpably wrong and unjust. This requires a reversal of the judgment and a remandment of the cause.Washington v. State, 274 Ala. 386, 148 So.2d 206 (1962); Smithv. State, Ala.Cr.App., 342 So.2d 422 (1977); Barker v. State, 55 Ala.Cr.App. 322, 315 So.2d 129, cert. denied 294 Ala. 752,315 So.2d 130 (1975).
Notwithstanding our expressed concern as to the question whether the evidence was sufficient to warrant the submission to the jury of the issue of defendant's guilt or innocence, we leave that question unanswered by us at this time. We deem it to be in the interest of justice for the State to determine whether it will continue the prosecution of this case and, if so, for the trial court to pass upon any question presented by defendant as to double jeopardy by reason of the past trial and any questions presented by defendant as to the sufficiency of the evidence, in any future trial, to justify a submission to the jury of the issue of defendant's guilt or innocence. In the event of another trial and a conviction and an appeal therefrom, an adequate opportunity will then be afforded for the appellant to raise again the issue that is now left undecided.
The judgment of the trial court should be reversed and the cause remanded.
The foregoing opinion was prepared by Retired Circuit Judge Leigh M. Clark, serving as a judge of this Court under the provisions of § 6.10 of the Judicial Article (Constitutional Amendment No. 328); his opinion is hereby adopted as that of the Court.
REVERSED AND REMANDED.
All the Judges concur.
[1] The statute provides "for his personal use only." Code of Alabama 1975, § 20-2-70. Although not essential to a correct determination of this appeal, an apparent incongruity is to be observed in the possession of a particular small amount of marijuana for a person's "personal use only" and the possession of the same marijuana at the same time by another person for his or her "personal use only."