LEIGH M. CLARK, Retired Circuit Judge.
Appellant wás convicted of murder in the first degree of his father, Anthony Scruggs, otherwise known as Otney Scruggs, by shooting him with a gun.
During the night of January 2-3, 1979, the house in which the defendant and his father lived, a rural residence in Dallas County known as Route 1, Box 395, Selma, was burned to the ground. An intensive investigation was commenced early the *309 next morning, and it was scientifically determined that a body found in the ashes was that of Anthony Scruggs and that his death was caused by No. 4 shot fired from two shells of a twelve gauge shotgun.
A large number of witnesses for the State testified in detail as to activities, before and after the crime, of defendant and Sam Sanders, a co-defendant who was with appellant a large part of the night. When the State rested, defendant rested without the presentation of any evidence.
Prior to the burning of the house, appellant and Sam Sanders borrowed a twelve gauge shotgun from Sam’s father for the ostensible purpose of shooting rabbits. There was testimony that prior to the fire, Sam Sanders, while accompanied by another whom the witness could not identify, bought some twelve gauge No. 4 shot shotgun shells at the Selma Curb Market.
Louis Blackmon, an older brother of Anthony Scruggs, testified that about 12:00 o’clock the night of the fire Johnny Lee came to his house and said:
“ . . .He wanted to see was his dad over there. Said he went to Montgomery and when he got back the house was burned down into ashes.”
He said he did not open the door for Johnny Lee to come in but that he noticed him as he left the house and that he was with Sam Sanders in an automobile as they rode away.
A witness, who was a wife of a first cousin of Anthony, testified that about 10:00 or 11:00 o’clock, after the fire, Sam Sanders and Johnny Lee came to her house and at that time there was a conversation between her and Johnny Lee in part as follows:
“And then Johnny Lee say, ‘You seen Dad? Y’all seen Dad? and I said, T ain’t seen him all day today.’ So Johnny Lee says, T left home this morning about 4:00 and went to town and I’m just getting back.’ He said, ‘The house done burned down. Lord, I hope they’re not in that house.’ Then Sam said, ‘Let’s go. Us has got to find Ootney [also spelled Otney].’ ”
There were other witnesses that testified that during the night of the fire the appellant and Sam Sanders were in the neighborhood of the residence of the victim and his son and that appellant made inquiry of them as to whether they had seen his father.
Howard Gray, an investigator with the Dallas County Sheriff’s Department, testified that on January 4, 1979, after he had received official information as to the results of the scientific investigation of the fire and the death of Anthony Scruggs, he “picked up” Johnny Lee and Sam Sanders and brought them both to the County Jail and booked them, as prime suspects. No contention is made that he did not have probable cause for making the arrest. He further testified that at 3:55 that afternoon, after he had fully explained to appellant his constitutional rights, in accordance particularly with Miranda requirements, appellant voluntarily and understandingly made a recorded statement, in question and answer form, which was in part as follows:
“O. k., Johnny what I want you to do I want you to tell me what happened leading up to the time that the house burned down with your father in it.
“Well, I went on the outside to get the night pot and after I went on the side to the get the night pot, Sam was on the outside and so when I went outside to get the night pot he stepped on inside the door and I heard something ‘pop-pop’, but what it was I don’t know and I asked him and I say well what is that? He say nothing but Otney drunk and throw two shells in the fire.’
“Did it shound like a gun firing to you?
“Well it sound like it was.
“It sound like a gun being shot to you?
“Yes, sir.
“And ah now when you said Sam, who are you talking about?
“Sam Sanders.
“Sam Sanders. Is that the man that was with you today when we picked you up?
“Yes sir.
“O.K., ah, prior to the time you went outside to the get the pot what hap *310 pened? Had you been with anybody that day?
“Yes sir.
“Who had you been with?
“Me, Sam Sanders and my father.
“Did you’ll come to Selma?
“Yes sir.
“What did you buy?
“A nine (9) volt transister radio.
“Did you buy anything else?
“Yes sir.
“What was that?
“Two (2) pints of whiskey.
“And did you’ll drink any of this whiskey?
“Yes sir.
“How much of it did you drink?
“All of it.
“Drank it all. Was that the three of you drinking it or what?
“Just the three (3) of us drinking it.
“You and your daddy and Sam.”
After the above quoted portion, the statement shows that Sam and Anthony engaged in a heated argument, that the three returned to the house that was afterwards burned and that the argument between Sam and Anthony continued until Sam left the house but returned soon thereafter, just before defendant said he was in the process of putting the “pot out” and Sam’s going into the house and defendant’s hearing the “pop-pop.”
Defendant’s recorded statement continues as’follows:
“0. k. what happened then?
“So he left by the door, he say man say let’s go and after he got out by the cattle gap, he say keep your damn mouth.
“He told you this?
“Yes sir.
“Did he say anything else?
“No sir.
“What did he, what did he say when you asked him about the noise?
“Oh, he say he say well, daddy had throwed two (2) shells in the fire and that bought daddy drinking he said daddy had throwed two (2) shells in the fire.
“0. k., when you all was there at the house did you see any fire then?
“No sir.
“Did you ever see any fire?
“Its a fire in the fire place.
“I’m talking about ah look like the house was on fire?
“No sir.
“How about when you was leaving, did you see any then?
“Yes sir.
“Well what did you see then?
“I seen a blaze.

“O.K., when you saw this fire did it look like a pretty good size fire? Did it look like the house was on fire or did it just look like a fire in the fire place?
“It was a big light, like the house was on fire.”
The recorded statement included questions and answers showing that defendant and Sam traveled around all night, that they were both drinking, and that defendant was “scared” to tell anyone about what Sam had done, that he “was scared after he had said other people done said he had killed his wife.” Defendant also said in the rest of the statement that he thought soon after the “pop-pop” in the fire that Sam had killed defendant’s father.
According to Inspector Gray’s testimony, defendant made another statement on January 8, 1979, under circumstances similar to the former one that met all requirements as to the admissibility in evidence of a confession or incriminating statement, in which defendant said that on the afternoon or evening before the fire and the death of his father, he had been with Sam when Sam bought four twelve gauge shotgun shells at the curb market, picked up a gasoline can from the house of Sam’s father, went downtown and bought some gasoline and put the can with the gasoline in it in the back of his automobile.
Appellant’s counsel makes a valiant plea for his client in charging that there is no substantial evidence of the guilt of defendant and that defendant’s motion to ex- *311 elude the evidence should have been granted at the close of the State’s case and that the affirmative charge in favor of defendant requested in writing at the proper time should have been given. We thoroughly agree that the absence of any proof of motive leaves much to be desired in appel-lee’s side of the issue. Is it true, today, when human life has become so cheap in the minds of so many, that the presence of a motive for murder is not as important as it once was? We certainly cannot explain why defendant would have been ah accomplice to the murder of his own father by Sam Sanders, but equally, if not more, inexplicable is the conduct of defendant, as stated by him and as corroborated by witnesses, including his relatives, that after believing that Sanders had killed defendant’s father, set fire to the home of defendant and his father, and left his father’s body to the ravages of the fire, defendant made no effort to so inform the authorities or anyone else, but with Sanders went through the repeated pretense of looking for Anthony, knowing that his body was in the ashes of the fire. Such a conclusion is so contrary to reason that a jury is not to be blamed for finding to the contrary. On more than one occasion on the night after the crime, he was in a place and position where he could have informed others of what he knew without danger of violence on the part of Sanders. Furthermore, it would seem that he should have known that the sooner Sanders was taken into custody the less opportunity Sanders would have for destroying or injuring defendant. We realize, as appellant argues, that defendant’s education was minimal, but the only plea in the case was not guilty. There was no plea of not guilty by reason of insanity, no evidence of insanity and no contention that defendant was insane. There is nothing to indicate that the verdict was influenced by any prejudice. The verdict should not be disturbed by those who are not in as good position as the jury to determine the issue of defendant’s guilt vel non.
Appellant raises an interesting question as to the admission in evidence of the second statement made by defendant to Officer Gray. The record shows that such statement made on January 8, 1972, was given by defendant after Officer Gray stated to him:
“You understand all your rights? O.K., Johnny Lee, what I have got I have got a little conflict in the statements that I got from you and from Sam Sanders. What I wanted to ask you about was ah, what you remember led up to going and buying some shotgun shells?”
Appellant argues that this statement by Officer Gray constituted an improper inducement that would vitiate a confession. We see nothing improper about the statement of Officer Gray, nothing in the nature of “a threat or promise, expressed or implied, operating to produce in the mind of the prisoner apprehension of harm or hope of favor,” which is the “true test.” Guenther v. State, 282 Ala. 620, 213 So.2d 679, cert. denied, 393 U.S. 1107, 89 S.Ct. 916, 21 L.Ed.2d 803; Sullivan v. State, Ala.Cr.App., 340 So.2d 878, 879, cert. denied, Ala., 340 So.2d 881 (1976).
During the testimony of R. G. Gades, a witness for the State, in testifying as to the purchase by Sam Sanders of four twelve gauge shotgun shells as mentioned above, that two men were present, one of whom he recognized as Sanders but the other he could not identify, objections were interposed by defendant as shown by the record as follows:
“Q Twelve gauge. What was said to you by these men?
“MR. LOCKETT: Objection to any statement made out of the presence of this Defendant.
“THE COURT: Overruled.
“Q (Continuing:) What was said to you?
“A He asked for some shells there and I told him I had these and showed him what I had.

“Q All right. What else was said to you, if anything?
“MR. LOCKETT: We object to any statements made out of the presence of this Defendant.'
*312 “THE COURT: Overruled.’
“Q (Continuing:) What else was said to you by these men, if anything?
“A That was all except when they got ready to leave I asked if that was all they needed and they said yes. They said if they needed any more, they could get them.
“Q Then if they needed any more—
“A If that didn’t do the job, they could get some more.
“Q That’s the best you can remember?
“A Yes, sir.
“Q If that didn’t do the job they could get some more? Did they leave then?
“A Yes, sir.”
Appellant urges that the court was in error in overruling his objections to the questions as noted above. He says that the testimony of the witness was “not a part of the res gestae” and did not come within any exception to the hearsay rule. The point is not well taken for two reasons. In the first place, the objections made by defendant were as to statements purportedly made by Sam Sanders out of the presence of defendant, but there was evidence in the case, at the time the questions were asked, that defendant was in fact present at the time the statements were made. In addition, there was evidence at the time the particular witness testified sufficient to justify an inference of a conspiracy between defendant and Sam Sanders to do violence to defendant’s father. What is done and said by each conspirator in furtherance of their common design is admissible in evidence against each other conspirator, whether done or said in the presence of the other or not. Cox v. State, 240 Ala. 368, 199 So. 806 (1941); Goodman v. State, 52 Ala.App. 265, 291 So.2d 358 (1974); Pope v. State, Ala.Cr.App., 365 So.2d 369 (1978).
Early cases have reversed for the refusal to give charges such as defendant’s requested written charge No. 12:
“I charge you that one should not be convicted on largely circumstantial evidence, however strong, if reconcilable with the theory that another may have done the act.”
However, in noting the confusion in variously worded charges on the subject in previous cases, Pitman v. State, 148 Ala. 612, 618, 42 So. 993, 995 (1907), held:
In view of this conflict of opinion in our own decisions, we remark, first, that such a charge is not proper at all, except in those cases where there is evidence pointing to one or more persons other than the defendant; second, it is not proper if the nature of the offense is such that both may have been guilty; third, if allowed at all, a ‘theory’ hypothesized should be a reasonable theory. . . . ”
In accordance therewith and with Owens v. State, 215 Ala. 42, 47, 109 So. 109 (1926), defendant’s written requested charge No. 12 was properly refused.
Appellant complains specifically of the refusal of several other requested written charges. In support of his position that the refusal in each instance constitutes reversible error, he cites a case in which the language of the charge is found in the opinion of the court on appeal. He draws the conclusion that the charge contains a correct statement of law and should have been given. He is clearly justified in concluding that a statement of law in an opinion of an appellate court of Alabama, unless subsequently' modified, is correct, but it does not necessarily follow that it should be given by the trial court in its instructions to the jury. In Wear v. Wear, 200 Ala. 345, 348, 76 So. 111, 114 (1916), it was said:
“ . . . It is a mistake to suppose that expressions in judicial opinions, properly there used, can be made to serve as clear, succinct statements of the law in special charges to the jury. K.C. & M.B.R.R. Co. v. Matthews, 142 Ala. 298, 39 So. 207.”
Appellant cites no case in which it was held that any of such several charges should have been given. In general, the excerpts from the cited cases were as to the sufficiency of circumstantial evidence to uphold the verdict and judgment of guilt, not as to instructions a trial court should give a jury on the subject. We find no authority that would justify the conclusion that the trial *313 court was in error in its refusal of any of such charges.
In addition to what we have said as to the refusal of defendant’s requested written charges, we should note that the trial court fully covered in its oral charge the subject of circumstantial evidence.
We find no error in the record prejudicial to defendant. The judgment of the trial court should be affirmed.
The foregoing opinion was prepared by Retired Circuit Judge LEIGH M. CLARK, serving as a judge of this Court under the provisions of § 6.10 of the New Judicial Article (Constitutional Amendment No. 328); his opinion is hereby adopted as that of the Court. The judgment of the trial court is
AFFIRMED.
All the Judges concur.