A jury found appellant-defendant guilty of murder in the first degree of Lelia Martin by shooting her with a gun and fixed his punishment at imprisonment for life. He was sentenced accordingly.
The only express issue presented on appeal is as to the sufficiency of the evidence to support the verdict and judgment. The question was presented to the trial court by motion to exclude the evidence, a written request for the affirmative charge in favor of defendant and a motion for a new trial. The trial court overruled each motion and refused defendant's written request for the affirmative charge in his favor.
Any and all evidence tending to show defendant's guilt was circumstantial. A large part of the lengthy evidence pertained to the question of the corpus delicti exclusively. There is no contention that the corpus delicti was not fully established. Appellant contends, as he did on the trial, that the alleged victim was not killed by him. Most of the following resume of the evidence will pertain to that question. *Page 1092 
The defendant and the victim lived within less than a block of each other in Birmingham, close to the northwest lineal segment of Center Street, which runs approximately northwest and southeast and divides areas that civil engineers have designated "North" and "South" from areas they have designated "West" and "Southwest" respectively, in their surveys, plats and street identifications of the city of Birmingham, which latter designations conform in general to compass directions. Mrs. Sheila Robinson testified that about 4:45 on Saturday morning, February 24, 1979, the victim came to her house, which was about two blocks from the victim's, and asked the witness to go to her laundromat and open it for her to wash some clothes, which she did. No one was with the victim at the time. She never saw the victim alive after that. The witness knew the victim well and had known the defendant about two months, having met him through his wife and having gone to hear him preach. She said that on the following Monday morning, the defendant came by her laundromat and asked, "Do any of you know the whereabouts of Mrs. Martin?" He did not receive an affirmative answer and then said that if they learned where she was to let him know.
Rosie Storey, who lived at 1621 Third Street, North, in the same neighborhood as Mrs. Martin, and had known her all of the life of the witness, testified that she saw her about 8:30 or 9:00 on the morning of Saturday, February 24, 1979, standing alone on a corner on Sixteenth Avenue. The witness further said:
 "She [Mrs. Martin] was fully dressed. She had a pants suit on, a short coat on. She had a wig on and glasses, her purse and an umbrella."
William W. Logan testified that about ten minutes after eleven o'clock February 24, 1979, a woman whom he did not know but who was identified by him by a picture of her as Lelia Martin, came into a grocery store he operated in Blount County, stating that she wanted to buy beer. Upon being told that he didn't sell beer, the woman left. The witness did not see anyone with her.
John B. Cole, Jr., testified that he lived at Blount Springs, just off County Road 7, that on February 24, 1979, "a little before noon," he heard two "gunshot sounds" that came from the direction of a creek at which he had a pump house about a mile by road and three-fourths of a mile by air from where he was when he heard the gunshot sounds. He testified that on the following morning between 9:30 and 10:00 he went to the pump house with members of his family, passing the house of Mrs. Ercelle Hawes about half way between the home of the witness and the pump house, and while in the area of the pump house, a corpse was discovered in the creek. It was thereafter determined, and the evidence conclusively shows, that the corpse was the body of the alleged victim and that she had been shot three times in the head by a small caliber gun and that the three bullets were still in her head. The testimony of Mr. Cole continued as follows:
 "Well, as I said, the little girls discovered a body and naturally we came over there. What I saw was this body laying face down, as I recall, in the water. . . . The water sort of . . . . the shallow part of the water that comes up where we pump the water out. It's not as shallow as it is out toward the middle of the creek. The body was lying right in this little shallow pool of water, just as you go in the pump house door.
"Q. And you said it was face down?
"A. As I recall it was.
 "Q. Now, describe . . . . describe the body. Describe the wearing apparel or the clothes you saw there.
 "A. Well, as I recall, the upper part of the body was covered, but the lower part of the body wasn't."
Mrs. Ercelle Hawes testified that on the morning of February 24, 1979, she left her house about 11:15 or 11:20 to go to a filling station to get some water and returned about thirty minutes later. She testified that while returning to her house and going in the direction of the pump house of Mr. Cole, which was about one-half mile beyond her house, she met an automobile coming *Page 1093 
from the direction of the pump house. She had known defendant in the past but had not seen him in many years. The automobile was driven by a man whom she did not recognize at the time, but she said she identified him afterwards as the defendant by pictures the officers showed her. She also identified him on the trial as the defendant.
There was undisputed evidence that the dwelling of the victim caught fire on the late afternoon of February 24, 1979. Evidence, if any, was scant as to the cause, the extent and the duration of the fire. The victim's daughter, who lived in Atlanta, came to Birmingham on the morning of February 26. She testified that defendant came to the home of her mother that morning (at which time she, and other neighbors apparently, had not learned of her mother's death) and talked with the witness. She said in part as follows:
 "I was looking for my mother and he came over and we was looking around the house with my kids and he went inside the house with us. And after we came out of the house I had a conversation with him. He told me that maybe she had got hit by a car. I told him I had checked all the hospitals and he said maybe when the house caught fire she ran and jumped in the creek."
There was a stipulation between the parties to the effect that if an absent criminalist who had examined the body of the deceased were present to testify, he would testify that he ran "all kinds of tests, as to whether Mrs. Martin was drinking or not at the time she was killed," and "that she was not," that "her blood didn't have any alcohol in it" and "there was no other type of drugs."
It was shown by Dr. Joseph A. Embry, a pathologist, a witness for the State whose qualifications as an expert witness were admitted by defendant, that in performing the autopsy of the body of the victim, he made fingernail scrapings and found:
 "Well, yes. The scrapings revealed, blue cotton fibers, red fibers, white fibers, clear fibers, red plate (that was with a fingernail file), black residue, sand and other debris."
Upon cross-examination of Dr. Embry, the following is shown:
 "Q. Doctor, did you have occasion to examine or somebody with your staff some dirt that was provided to you?
"A. Yes.
 "Q. All right, sir. Do you know where that dirt came from?
"A. Just by memo.
 "Q. Well, you may testify from the memo. It's in the ordinary course of your business.
 "A. It was from the mudhole if that's the dirt you are talking about.
"Q. Yes, sir.
 "A. (Reading) `One glass jar contained wet soil identified as from "mud" in homicide area.' There was also wet soil from `creek tracks' in the homicide area.
 "Q. I believe, Doctor, there was another quantity of soil.
 "A. Right. Identified as from the automobile belonging to Curtis Ray Parker.
 "Q. And what would that . . . . what were the results of that?
 "A. The memo states, `The laboratory examinations reveal the soil contained in item No. three, item No. four and item No. five (which are the soils I just described) to be generally similar. . . . . . .'
 "THE COURT: I don't believe the Court Reporter got that.
 "A. The three soils were . . . . the two from the mud hole and the creek track and from the automobile were generally similar with slight differences regarding color, microscopic appearance and density.
 "Q. Would that mean, doctor, that those did not come from the same area?
"A. This is not my area of expertise.
 "Q. But there was a difference in the dirt. That's what this says.
"A. It says a slight difference."
On redirect examination the witness continued:
 "Q. Doctor, since Mr. Allen asked you about that slight difference, if an automobile *Page 1094 
passed over an area and picked up some dirt particles that would be similar to a controlled specimen, such as that in the jar, but proceeded to travel and spin up some additional soil, would that account for a slight difference?
". . . .
"A. It sounds reasonable to me.
 "Q. It sounds reasonable, doesn't it, that that would account for a slight difference?
"A. Yes."
In addition to the evidence presented by the State on the contested issue of defendant's guilt or innocence of the undisputed unlawful homicide of the alleged victim as summarized above, the State introduced, without any objection by defendant, a twenty-seven-page statement by him in question and answer form. The statement had been obtained on March 1, 1979, by an officer of the Police Department of the city of Birmingham, who at the time was accompanied by an officer of Blount County. According to the police officer, who read the statement to the jury while appearing as a witness for the State, the voluntariness and the other constitutional requisites were thoroughly established. There has been no contention to the contrary. In it we find the only evidence presented by the State, other than the testimony of Mrs. Hawes, as to the whereabouts and activities of defendant within a period of several hours before or after gunshot sounds were heard by Mr. Cole and defendant could have been seen by Mrs. Hawes.
The statement was first recorded on a tape recorder and thereafter typed. It discloses that defendant had previously lived at a place called Mountain Brook in Blount County, about five miles from Hayden and that his father and mother had lived there for many years and were living there on February 24, 1979. The defendant said that about 11:00 A.M. he telephoned his mother, which was not by long distance from Birmingham, and told her that he was on his way up there to get some cracklings that his brother had brought over from Arkadelphia, a town in neighboring Cullman County. He said that at the time he was "rushing up there to my mother's and get the cracklings and come on back" to go to a funeral of one Parker Skinner at 2:00. He said that at the time he understood that the funeral was to be in Birmingham close to where defendant lived, but in leaving he learned from "a blind lady named Millers sister" who "lives on the same block" that the funeral would be at the "Colony Grave Yard" at or near Arkadelphia. According to the statement, defendant drove his automobile, with no one accompanying him, to his mother's home, arriving there "about 12:00," talked with his father and mother, obtained the cracklings and some peaches and peas that his mother gave him and "four bags of Cracker Jacks for the little girls." His statement continues as follows:
"How long do you think you were at your mama's house?
"All total?
 "Well, I'd say at least twenty . . . . twenty-five minutes maybe . . . . maybe that long.
 "Okay, and then you left there and you went to the church there at Arkadelphia?
"Right.
"About what time do you think you got there?
 "Well, I'd say it was around 12:30, I guess, you know, approximately 12:30, you know.
 "Okay. And you say that the body was already in the church. Right.
"Right. Right. The body was already in
. . . .
"And the wake was going on. Right? "Right. Right.
"Had it started?
 "Well, I think . . . . the funeral was supposed to have been there at 1:00. I believe it was 12:30-12:32 1:00 and the funeral started at 1:00 or 2:00, some time. In other words, we was all men and fellows standing out there talking and so . . . . after we got through, you know . . . . they said . . . somebody said, `Well, I'm going in there and review the body' and somebody said, I think it was Arthur Johnson, said, `Now, they done set the *Page 1095 
casket up.' And they said, Well, why did they call for the wake to be this long' and they said, `Well, they ain't gonna open the casket no more.' So I just stood around there and talked to them awhile, you know, and messing with friends. I hadn't been up there in about. . . .
 "Did you go with anybody when you went to your mother's and then when you went to the funeral?
"Was anybody with you or were you by yourself?
"I was by myself.
"By yourself?
"Yes, sir.
 "Now, name some of the names of the folks that you talked to at the funeral, you know? At the wake and all.
 "Well, there was my first cousin. That's Bubba. He stayed in Blount Springs.
"What . . . . do you know his full name?
"Noah Teague. They call him Bubba.
"Noah Teague?
"Yes. His full name is Noah Teague.
". . . .
"And I talked to Leon Turner. . . .
"Where does he stay?
 "Well, he stays in Colony, too. And I talked to Fred Turner. . . . Fred Turner. . . . And I talked to Thomas Hall, J. Hall, and you know, just several. . . . I can't just call everybody, you know.
"Okay. Okay. I just wanted a few names. Okay.
"Then you stayed through the funeral?
"Yes, sir.
 "Did they bury the body there at the church in the graveyard?
"Yes, sir.
"So you stayed until they buried the body?
 "Yeah. Well see. . . . They had . . . . I was talking to my uncle `cause my uncle and my sister-in-law and all of them they was there, you know and my ex-old lady she was there too.
 "Okay. And you stayed there until the funeral was over with?
"Right. Right.
"And then you left?
"Right.
"Did you leave with somebody?
"No, I left by myself.
"Okay. And came back to Birmingham?
"Yes, sir.
"You came back. About what time did you get back?
 "Well, I'll say. . . . I'll say it was at least about 3:00.
"About 3:00?
 "About 3:00 or 3:30 because when I came back . . . . see. . . . I had promised a man be down here at the church . . . . down at the Great Immanuel Temple. Some cracklings. He told me when my brother killed hogs that he wanted some of them cracklings.
". . . .
"And then you came on home?
"Right.
". . . .
 "Now, we asked this woman's name. I can't remember the woman's name. Lelia Martin. When was the last time you saw or heard of or know Lelia Martin? `Well, it was on a Friday evening. Friday evening, Friday evening before I went to work. I leave home to go to work about 2:30 and me and Mr. . . .
 "I think you said it would have been about 2:15 or some place around there?
"Yeah. It was 2:15 or some place around three.
"On Friday?
"Last Friday.
"And Miss Miller [sic]
 "Miss Miller [sic]. Me and Mr. Bradley was setting on the porch. He was setting there talking to me. She came over talking for the Heart Fund?
"Right.
"And you gave her some money?
"I gave her a dollar.
"And then you saw her go next door?
 "Go over there. She was walking out there `cause everybody round there said her mind was bad and all, but they ain't nobody never went to her house, you know, `cause she would holler for them *Page 1096 
out there in the street, said Miss Martin. . . . Miss Martin . . . . and I think she come to the door while from my house, when I'm sitting on the porch. You can't see around to her house, you know.
"But you heard her talking?
 "Yeah. And I heard her say something about she didn't have no money or something like that.
"And that was on Friday?
 "Right. Friday before I went to work — Friday evening.
"And that's the last time you know of seeing her?
"Yes, sir."
Thereafter in the lengthy statement of defendant, he said that "during Christmas last year" he had "picked up her pecans and sold her pecans" but that she had "never ridden in his car" and that he had never "taken her to any kind of store." He was then asked, "How did you come to find out the house was burned?" He then related in considerable detail a discussion with his wife about what they would have for supper, that he left the house, went to a nearby restaurant and bought some chicken for supper and while returning about 5:00 he heard a siren blowing; that after he had proceeded on to his house, stopped his automobile, gone into the house and placed the chicken in the house, he then hurriedly went across the street and entered into excited conversations with at least two people, whom he knew and identified, as to where Mrs. Martin was. He also said that a neighbor, a Mr. Robinson stated, "Somebody liked to run up here on this porch and liked to kicked my door down," and that when he "got to the door . . . they jumped off the porch and run and jumped in the car." Defendant further said in his statement that he first learned on February 26 that Mrs. Martin had been killed and that her body had been found in Blount County. He said that he had filled his automobile with gasoline on Friday night before he went to Blount County the next day, that he did not stop on the way to his mother's house, on the way therefrom to the funeral at the Colony near Arkadelphia or on the return trip home. He stated that he washed his automobile after he returned home Saturday as was his custom in getting ready for Sunday. He said, furthermore, that he had never owned any kind of a gun, that he did not know whether Mrs. Martin owned a gun, that he had never had any trouble with Mrs. Martin, that on Monday, February 26, the left back tire on his automobile went flat with a nail in it and that it was replaced with a new tire and that the flat tire was placed in the trunk of his automobile and was still in it at the time of his statement. He said that in driving to his father's house from the highway he went over a muddy road, that he did not know exactly where the body of Mrs. Martin was found, that he was not in that particular area on Saturday, February 24, and that he did not know of the existence of a pump house there. He acknowledged having worked as a boy for one or both of the farmers in that area by the name of Hawes, but he disclaimed close acquaintance with the people generally, and the area of Blount County involved, during the then preceding several years. Part of his testimony on the subject was as follows:
"I mean, you just don't like Blount County?
 "That's right. I just . . . You know, my people, you know, they always tell me, you know. . . . Like I go fishing up there sometimes and they always tell me when you go fishing to always carry somebody with you, you know, because, you know, they really, you know. . . . . They don't want me to, you know, ever. . . .
"Have you had a lot of trouble in Blount County?
 "Well, they mess me around up there, you know — lied on me and things like that. Just like this right here, you know. I get . . . . man, you just don't know how it is. You know what I'm saying is. . . . You be framed for things. See, I hate to get angry about anything.
". . . ."
The first witness called by the defendant was Mr. Billy Irvin, an investigator for the *Page 1097 
Sheriff's Department of Blount County, who was the first law enforcement officer to "survey the scene" of the crime. He said he found no weapons, that the clothes of the deceased were under her body, that he found no shoes or purse, that he saw car tracks and that the area was muddy. He found no tracks of human beings there. He afterwards went to the home of the defendant and searched his home and his automobile. He said that he found nothing in either that "connected him with the crime." He further testified that he talked with many people in the community where defendant lived but couldn't find anybody that saw defendant with the victim on February 24. According to the witness, the home of defendant's father and mother is about "two to three miles from the scene where the body was found."
By the testimony of Mr. Zein W. Bagley, "the director of outpatient at Norwood Clinic," defendant's counsel showed that the distance measured by an automobile odometer from defendant's home to Mr. Logan's store is 25.9 miles and that traveling there at approximately 55 miles an hour took 36 minutes; that the distance from Mr. Logan's store to Mrs. Hawes was 10.4 miles and that traveling that distance took him 14 minutes and that it took him two minutes to travel from Mrs. Hawes to the pump house, making a total travel time of 52 minutes. On cross-examination of the witness, it was established that the road that led off the highway to Mr. Cole's farm to the Hawes' farm and to the pump house could hardly be considered a public road, that the first part of the road was better than the rest and that for about a mile before reaching the pump house there were "grass and briars and stuff" that were "as high as the radiator" of the automobile but not "over the hood of the car."
Michael Rich testified that he brought defendant from work in the automobile of the witness to the home of defendant about 2:25 A.M., February 24, left defendant at his front door, noticed that defendant's four-door green Maverick was in the yard and saw defendant go to his front door. He did not see defendant again until the following Monday.
Mrs. Mary Williams testified that on February 24, "after 11:00" or about "11:30 or 11:40," defendant came by her house in the same neighborhood and asked her about the arrangements and time for the funeral of Parker Skinner, the husband of her first cousin. She told him that the funeral was to be at the Colony; he said she could go with him and she replied: "No, I hadn't made no arrangements. Naw, go on." He then left. She also testified that she had been brought up at Mountain Brook in Blount County and had known defendant's "mama and daddy." She said no one was in his automobile with defendant at the time; that defendant's red coat was lying across the seat. She said that she saw him again at her house about 4:00 P.M. that Saturday; he told her that he had attended the funeral and then he proceeded toward his home.
The father of defendant testified that defendant came to the father's house "around 12:00" on February 24, 1979, stayed there around thirty minutes and then left for home. He said that he called up later on that day and told them that he had gone by the funeral of Parker Skinner. He said he didn't pay any attention but that defendant's clothes "looked clean to me," that defendant had on a blue shirt and that his coat was in his automobile. He said his other son lived in Cullman County, where he killed a hog and brought the cracklings over for the defendant to pick up.
Oscar William Parker testified that he lived in North Birmingham, that he also was a brother of the defendant, and that between 3:30 and 4:00 on February 24, defendant stopped by his house to leave some cracklings that had been sent by another brother. Defendant told him that he had been to the funeral of Parker Skinner, that he stayed at the house of the witness about fifteen minutes.
Defendant's wife testified that she worked at Norwood Clinic and that a previous witness Mr. Bagley was her "boss." According to her testimony, she was at home when defendant returned from his *Page 1098 
work about 2:30 on the morning of February 24; she fed him before they went to bed; she left home about 7:45 to go to a seamstress and from there to the grocery store, leaving her husband before he got up. Thereafter, she went to the Farmer's Market. She was traveling in her husband's automobile. When she returned home, which was "between eleven and eleven-thirty" her husband was on the porch waiting for her. According to her further testimony, he asked her if she "wanted to go to his mother's house and to a funeral with him," but she did not go. After he helped bring in the groceries, he left. She next saw him about four that afternoon. She said:
 "Well, when he came home, he drove between the house like he usually do when he come from up in that area and he washed the car. And each time when he comes from down there, the car's all muddy . . . red mud and so he washes it."
They discussed what they would eat for supper; he left to get some chicken, and before he returned with it, she "heard the siren." He rushed into the house, "dropped the chicken in the chair" and went outside. She learned that the fire was "at Lelia Martin's house." He returned "about an hour and a half or two later" and never went out again that night. She was intensively and extensively cross-examined as to her movements between the time she left the house that morning and returned with the groceries and as to her conversation with a former patient whom she had nursed and as to the time that intervened between her return to the house and defendant's departure. She said that he spent "about . . . . maybe ten or fifteen minutes" taking the groceries out of the car and taking them in the house and putting them down," and about five minutes more before he left.
Upon being closely questioned on cross-examination as to the points and periods of times of her and her husband's activities on the morning of February 24, defendant's wife said as to the time he left, "I didn't just watch the clock. I would judge maybe between 11:30 and 12:00." She said that she left the grocery store "about 9:50" and then went to the Farmer's Market where she stayed "about twenty minutes," and thereafter went home. The grocery store was in a shopping center, several blocks but only about a mile from the Farmer's Market, which like the defendant's home was in the northwestern area of Birmingham. The seamstress was in Smithfield, "some four miles" from where she and defendant lived, at 313 Fifteenth Avenue, North. She also testified on cross-examination that she had known Lelia Martin between ten and eleven years, that she knew her before she and defendant were married. She said that she lived at 313 Fifteenth Avenue, North, before she and defendant married and continued to live there from the time they married, that Lelia Martin lived by herself, that there was one house between the house where Lelia Martin lived and the house where defendant and the witness (defendant's wife) lived.
There is little, if any, disagreement between the parties on appeal as to the governing principles of law. The disagreement is as to the applicability of those principles to the evidence in the case. Although there is a tendency toward a blending of the time stages of the contentions and counter-contentions, we deem it appropriate to note that appellant's challenge as to the sufficiency of the evidence took place at three distinct stages of the proceedings in the trial court, and that there is some difference as to the sufficiency of the evidence in each of such stages. The first stage was at the conclusion of the evidence for the State, the second at the end of the trial, and the third on the motion for a new trial. In many of the cases in which the sufficiency of the evidence has been upheld, the action was as to all three of the stages, but in some cases, and this is one we think, the question should be considered in each of the three stages separately in order to arrive at a correct determination of the appeal.
In order to test the sufficiency of the evidence to support a verdict that defendant is guilty, defendant does not have to rest when the State has rested. He may then present a motion to exclude the evidence, *Page 1099 
and even though the court overrules the motion and thereafter defendant proceeds to introduce evidence that supplies any previous insufficiency of the evidence, he has preserved his right on appeal to obtain a reversal if the evidence at the time of the motion did not make out a prima facie case when viewed in the light most favorable to the State. Kontos v.State, Ala.Cr.App., 363 So.2d 1025, 1033-1034 (1978); Williamsv. State, Ala.Cr.App., 340 So.2d 1144, cert. denied,340 So.2d 1149 (1977); Morton v. State, Ala.Cr.App., 338 So.2d 423
(1976); Tooson v. State, 56 Ala. App. 613, 324 So.2d 327 (1975). However weak the evidence for the State may have been at that time, we do not doubt that a prima facie case against defendant had been presented. Even though there was little conflict in the evidence that had been presented, there was no occasion for the court to undertake a weighing process, any kind of a juxtaposition of evidence for the State and evidence for the defendant; there was no opportunity for a comparison between the evidence presented by the State and the evidence thereafter presented by defendant. The court's duty then was to determine whether there was any evidence, even though entirely circumstantial, that defendant was guilty. We must conclude that there was. The corpus delicti had been unquestionably established; circumstantial evidence, including particularly the evidence that defendant had been seen driving an automobile within about a mile of the remote place at the end of a remote country road where the victim was killed, close to the time the defendant was seen, constituted substantial evidence that pointed to him as the murderer. The court was not in error in overruling defendant's motion to exclude the evidence.
Perhaps a closer question exists as to the sufficiency of the evidence at the conclusion of all the evidence. By that time, defendant had presented considerable evidence to the effect that he was probably not at the place where the alleged victim had been killed at the time she was killed. This evidence did not come merely from the statement he had previously made that had been introduced in evidence by the State, but from others, including members of his family, his father, his wife and his brother, which, if true, did not absolutely exclude the possibility of his guilt, but which tended to corroborate his claim, as expressed in his written statement, that he was not guilty. The evidence did not, however, vitiate, though it may have weakened, the testimony of Mrs. Hawes and the testimony of Mr. Logan, which when considered together, in connection with all the circumstances of all of the evidence, constituted substantial evidence of his guilt and justified a submission of the case to the jury. The court was not in error in refusing the affirmative charge in favor of defendant requested by him in writing.
One of the grounds of defendant's motion for new trial, which was overruled, alleged:
 "That the jury's verdict is not supported by the great weight of the evidence."[1]
The trial court correctly charged the jury as to its responsibility in passing upon the weight of the evidence, with appropriate emphasis upon the fact that all of the evidence of defendant's guilt was circumstantial. Both the State and defendant expressed satisfaction with the court's charge.
In the court's oral charge we find:
 "The guilt of a defendant may be proved by circumstantial evidence, as well as by direct evidence. The test of the sufficiency of circumstantial evidence is whether the circumstances as proved produce a moral conviction to the exclusion of all reasonable doubt of the guilt of the accused, whether they are incapable of *Page 1100 
explanation upon any reasonable hypothesis consistent with his innocence. Upon circumstantial evidence there should not be a conviction unless to a moral certainty it excludes every other reasonable hypothesis than that of the guilt of the defendant. No matter how strong may be the circumstances, if they can be reconciled with the theory that someone else other than the defendant may have done the act, then the guilt of the defendant is not shown by that full measure of proof the law requires."
Perhaps there was an inadvertent omission of the word "reasonably" between the words "be reconciled" as they last appear together in the quoted portion of the charge, but on the whole the charge states that which the authorities have uniformly held. Ellison v. State, 254 Ala. 428, 48 So.2d 176
(1950); Smith v. State, Ala.Cr.App., 342 So.2d 422 (1977);Bluth v. State, 38 Ala. App. 692, 92 So.2d 685 (1957); Whatleyv. State, 37 Ala. App. 706, 75 So.2d 182 (1954); Byrd v. State,37 Ala. App. 121, 73 So.2d 376, cert. denied, 261 Ala. 697,73 So.2d 378 (1954). It is to be observed that there is a limitation upon the principle to the effect that it does not apply in a case in which the "some other person" or "some person other than defendant" could be considered as some person acting in concert with defendant in the commission of the crime. See Scruggs v. State, Ala.Cr.App., 380 So.2d 308 (1979) and authorities therein cited. There is no evidence in the instant case to the effect that any other person was acting in concert with defendant in the commission of the crime. There is no contention to that effect.
A court on appeal should not treat lightly the line of demarcation between its function and that of the trial court, especially as it relates to a motion for a new trial grounded on the question of the sufficiency of the evidence to support the verdict. It should not reverse the trial court for its denial of such a motion merely because the court on appeal concludes that it would have granted the motion if it had been the trial court. To do so would ignore the fact that the trial court, which hears and views the witnesses as they testify, is in a better position than an appellate court to determine questions as to the sufficiency and weight of the evidence. Nevertheless, when the court on appeal, after giving the trial court the favorable presumption to which it is entitled, is convinced that it is so contrary to the weight of the evidence that it is palpably wrong or unjust, it becomes its duty to reverse the judgment and remand the cause for another trial.Smith v. State, Ala.Cr.App., 342 So.2d 422 (1977); Barker v.State, 55 Ala. App. 322, 315 So.2d 129, cert. denied, 294 Ala. 752, 315 So.2d 130 (1975); Davis v. State, 33 Ala. App. 299,34 So.2d 15, cert. denied, 250 Ala. 240, 34 So.2d 17 (1948);Skinner v. State, 22 Ala. App. 457, 116 So. 806 (1928).
Except for the testimony of Mrs. Hawes, there is little, if any, evidence in the instant case that is not as reasonably reconcilable with defendant's innocence as with his guilt. Furthermore, except for the testimony of Mrs. Hawes, there is little conflict in the evidence. The startling coincidences that the alleged victim was killed within a few miles of where defendant was reared and where his parents still lived, that defendant was in the area of his parents' house at the time she was killed, and that defendant and the victim were almost next door neighbors at a place about one hour's travel time away, are circumstances giving rise to strong suspicion and understandable cursory notions that he was the murderer, but they do not constitute proof thereof. Most of the circumstances when fully illuminated are just as consistent with his innocence as with his guilt. It can be argued that he chose a place with which he was familiar for the scene of his crime and the disposal of the body in preference to a place with which he was not familiar; on the other hand, it can be argued that with murder in his heart he would have chosen a place where he was not known and not as likely to have been identified as one being near the scene of the crime. His acquaintance with the victim is as consistent with his innocence as with his guilt. Whatever his motive for killing a woman would have *Page 1101 
been, he would likely have directed it at a target more appealing to his motive.
We looked in vain for some connection between the evidence as to the fire at the victim's home on the late afternoon of February 24, 1979, and her death that apparently occurred a few hours before, but no light on the subject was shown by anything in the transcript or by anything in the briefs of respecitive counsel. The evidence as to defendant's conduct relative to the fire is as consistent with his innocence as with his guilt. His manifested interest in and concern about the fire and the presence or absence of Lelia Martin were not materially different from that shown by other neighbors.
Without accepting defendant's denial of his guilt in his written statement he gave the officers on March 1, 1979, it is our view that his lengthy statement as to his conduct and activities on the day of the murder is as consistent with his innocence as with his guilt. There is little, if any evidence, except the testimony of Mrs. Hawes, that tends to show that any of his statement is false in any substantial respect.
The case as a whole impresses us as one in which there is little, if any, claim and little, if any, basis for a claim that any witness wilfully swore falsely in his or her testimony. All of the testimony can be reasonably reconciled with all of the other testimony without any imputation of intentional falsity on the part of any witness. No attack is made upon the good faith and the honesty of opinion of Mrs. Hawes, and we accept her testimony as an honest reproduction of her belief that the man identified as defendant was the defendant, and that it could be reasonably inferred from such testimony that defendant was the person who killed Mrs. Martin. On the other hand, the overwhelming weight of the other evidence in the case is to the effect that defendant would hardly have been able, within the time frame of the evidence in the case, to have driven Mrs. Martin in his automobile to the place where she was killed, there shoot her three times, then dispose of her body as shown by the evidence and thereafter make himself presentable at the home of his mother and father and at the funeral at Arkadelphia.
The testimony of Mr. William Logan is as consistent with defendant's innocence as with his guilt. Although doubtless true, it presents an unsolved puzzle in the case. According to his testimony, Lelia Martin went into his store to purchase some beer. She did not obtain it. According to the expert testimony in the case, she had not drunk any alcoholic beverage at the time of her death. For whatever it is worth, it should be noted that Mr. Logan's store was not at the intersection of Interstate 65 and the exit to Blount Springs where Mrs. Hawes lives or the exit farther north to Arkadelphia, but at the intersection with Alabama 160 to Hayden in Blount County. The statement of defendant as given to the officers indicated at least that when he turned off Interstate 65 to go to his parents' home, he turned off on the Blount Springs rather than the Hayden exit. There is no evidence in the case to dispute the statement of defendant that he was not a drinking man. The testimony of Mr. Logan that Lelia Martin was in his store about ten minutes after 11:00 is somewhat at variance with the statement of defendant and the testimony of defendant's witnesses as to the time he left Birmingham and the time he arrived in Blount County if it is assumed that Lelia Martin was with him, but there is no testimony by anyone that she was with him then or at any other time that day.
The testimony of witnesses, including the victim's daughter, as to inquiries as to the whereabouts and welfare of the victim that were made by defendant between the time of the fire at the victim's home and the time it was generally learned in the neighborhood that she had been killed in Blount County, is as consistent with defendant's innocence as with his guilt. Whether it points any more in the direction of his guilt than for him, a professed preacher of some kind, to have gone into seclusion or shown no concern for or interest in a close neighbor, living alone, whose house had burned *Page 1102 
and who had apparently disappeared from the neighborhood is anyone's guess. To say, as he did, that "maybe she had got hit by a car" seems but a natural comment, whether from a guilty or innocent person. If the statement that "maybe when the house caught fire she ran and jumped in the creek" is to be construed as significantly related to the fact that the victim's body was found in a creek where it had been evidently placed by her murderer, such significance seems to be lost when it is noted that, within a few blocks of the home of the victim, there is a much larger creek, Village Creek, that runs the entire length of Industrial Valley of Birmingham.
We take into consideration the testimony of the expert as to the fingernail scrapings found during the autopsy of the victim's body in connection with the other evidence in the case, as to which appellee says:
 ". . . There was also testimony that Appellant had on a blue shirt on the day in question (R. 222) and had a red jacket in his car. (R. 215). Fingernail scrapings from the deceased revealed blue fibers and red fibers. (R. 81). . . ."
The first two references to the record are to the testimony of defendant's father that defendant had on a blue shirt but had left his coat in his automobile while he was at the home of his father and mother on February 24 and to the testimony of Mrs. Mary Williams that defendant's red coat was on the seat of his automobile that morning when he came by her house to inquire about the funeral of the husband of her first cousin. As has been noted above, there was testimony of an expert that the fingernail scraping revealed white fibers in addition to red and blue fibers. The possibility of the fibers having come from defendant's clothing is clear, but the likelihood thereof is not, when, as here, there is no shred of evidence of any clawing or scratching of defendant's body or clothes and the evidence does not show the color of the victim's clothes that she wore after having gone to the laundromat to launder her clothes.
We give special consideration also to the evidence as to the soil test on samples of soil from the area where Mrs. Martin's body was found and on the sample taken from appellant's automobile. We do not doubt, though we do not know, that there could be such a distinctiveness about the "color, microscopic appearance and density" of soil in the area where her body was found as to furnish the basis for an inference, or the testimony of an expert in such matters, that some of that same soil was found on defendant's automobile a few days later. There is no such evidence in this case. As heretofore shown, both parties attempted to obtain aid on the subject from the distinguished pathologist who testified as to his examination of the body of the victim, and each party seems to have obtained some satisfaction from what he said, but it is to be observed that such apparent satisfaction is as to the extent of the similarity and dissimilarity between the samples of soil from the area and the sample of soil from the automobile. When asked by counsel for defendant whether the results of the test meant "that those did not come from the same area" he replied, "This is not my area of expertise." There was no expert testimony either way on that subject. Whether it can be obtained, we do not know, but, without it, any contention that there is evidence that soil from the place the body was found was also found on defendant's automobile is not sustained by evidence or judicial knowledge.
The established fact that an alleged murderer was near the scene of a murder when it occurred varies in significance on the issue of his guilt in accordance with all the other circumstances, particularly the distance and the extent of travel or intercourse between the place of the murder and the home of the alleged murderer, or other site or area frequented by him. The undisputed evidence is sufficient to show that defendant was in the general area, within a few miles, of the place the victim was killed at the time she was killed, but the remarkable coincidence loses much of its significance when exposed to the light of all the circumstances. In addition to the circumstances heretofore stated herein, which include the fact that people other than defendant *Page 1103 
living in the same general area as defendant and the victim had their roots in the same general area where each of them was at the time of the alleged murder, we should note that geography, history and agricultural enterprise still current afford a more intimate linkage between the two areas than the mere distance between them suggests. There still exists, close to the homes of the defendant and the victim, a segment of old Arkadelphia Road, which in the infancy of Birmingham and for many years thereafter ran its tortuous course through northern Jefferson County into Cullman County, near its boundary with Blount County, and provided the best way for travel between the two places, then like a distorted tail, but now a relic of a part of a true "Tale of Two Cities."
From Arkadelphia and neighboring areas where defendant surely was when the victim was probably killed, came many of the first settlers of Birmingham; some of them and their posterity have brought distinction to their family names in many fields including medicine, law and commerce. The references in the evidence to Farmers' Market, near the home of the defendant and the victim, and to the farm of Mr. or Mrs. Hawes near the home of defendant's father and mother and near the place the victim was probably killed, are reminders of the well known extensive perennial travel, commerce and relationship between the area where the defendant and the victim lived and the area where it appears that she was killed. It is a well known fact that almost every day throughout each year there are many people from the regions mentioned at the Farmers' Market, that products from the farms of those regions have constituted one of the greatest and most noteworthy sources of supply for the Farmers' Market. It naturally follows that whoever killed Mrs. Martin, whether appellant or not, was not necessarily in a strange land when he killed her.
To summarize, there is no direct evidence of defendant's guilt; the only substantial circumstantial evidence of his guilt is the testimony of Mrs. Hawes in her identification of him as the man she saw driving an automobile from the direction of the place Mrs. Martin's body was found. Even though she was sure in her own mind that her identification was correct, she only had a momentary profile view of him from his shoulders up while the two were traveling in opposite directions. When this is considered in connection with all the other evidence in the case, we are convinced that the evidence against him is so weak and the evidence in his favor is so strong that he is entitled to a new trial. The judgment of the trial court should be reversed and the cause remanded.
The foregoing opinion was prepared by Retired Circuit Judge LEIGH M. CLARK, serving as a judge of this Court under the provisions of § 6.10 of the Judicial Article (Constitutional Amendment No. 328); his opinion is hereby adopted as that of the Court.
REVERSED AND REMANDED.
All the Judges concur.
[1] With the exception of the use of the word "weight" instead of the word, "preponderance" the ground stated is the same as the ground stated in Code of Alabama 1940, Tit. 7, § 276, which prevailed until modified as to criminal procedure by Code 1975, § 15-17-5. We take it that the change in language has not worked a change in substance as to an appropriate ground for a new trial, and that the often stated view of the Supreme Court that the particular language need not be literally followed is still applicable. Stallings v. State, 249 Ala. 1, 32 So.2d 233
(1946); Lightfoot v. State, 250 Ala. 392, 34 So.2d 619 (1948).